# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

––––––––––––––––––

ASSOCIATED BUILDERS AND CONTRACTORS and ASSOCIATED BUILDERS AND CONTRACTORS FLORIDA FIRST COAST CHAPTER,

Plaintiffs-Appellants,

v.

GENERAL SERVICES ADMINISTRATION, et al.,

Defendants-Appellees.

––––––––––––––––––

On Appeal from the United States District Court
for the Middle District of Florida

––––––––––––––––––

**BRIEF FOR APPELLEES**

––––––––––––––––––

BRETT A. SHUMATE
  *Assistant Attorney General*

GREGORY W. KEHOE
  *United States Attorney*

CHARLES W. SCARBOROUGH
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In addition to those listed in appellants' Certificate of Interested Persons, the following individuals or entities have an interest in the outcome of this appeal:

Farby, Lesley (Counsel for Defendants)

Kehoe, Gregory W. (Counsel for Defendants)

Littler Mendelson, P.C. (Counsel for Plaintiffs)

Messenger, William (Counsel for Amicus Curiae)

National Right to Work Legal Defense Foundation (Amicus Curiae)

Richardson, Monte C. (Magistrate Judge)

Roth, Yaakov M. (Counsel for Defendants)

Scarborough, Charles W. (Counsel for Defendants)

* Shumate, Brett A. (Counsel for Defendants)

*/s/ Daniel Winik*
Daniel Winik

* Additions to previous certificate marked with an asterisk.

## STATEMENT REGARDING ORAL ARGUMENT

The government believes the Court could affirm the district court's denial of a preliminary injunction without oral argument, but it stands ready to participate if the Court would like to hear oral argument.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE ............................................................. 2

      A.    Project Labor Agreements (PLAs) .................................... 2

      B.    The Challenged PLA Directive ........................................ 3

      C.    This Litigation .................................................................. 9

      D.    Standard of Review .......................................................... 13

SUMMARY OF ARGUMENT ............................................................. 13

ARGUMENT ...................................................................................... 18

I.    The District Court Acted Within Its Discretion In Determining
    That Plaintiffs Had Failed To Show Irreparable Harm ....................... 18

      A.    CICA Violations In Particular Solicitations Can Be
             Remedied Through Bid Protests ....................................... 18

      B.    There Is No Basis To Believe Any Subcontractor Member
             Of The Plaintiff Associations Faces Irreparable Harm ............... 26

II.   Plaintiffs Also Failed To Establish A Likelihood Of Success On
    The Merits Of Any Claim ............................................................... 28

      A.    The Challenged Directive Does Not Violate CICA .................... 28

      B.    The PLA Directive Is Within The President's
             Constitutional And Statutory Authority ......................... 34

C.    The Challenged Directive Is Consistent With The First Amendment...........................................................................46

D.    Plaintiffs' Other Claims Are Meritless ..........................................52

CONCLUSION ................................................................................... 57

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Associated Builders & Contractors of Southeast Texas v. Rung*,
    2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ....................................................52

*Associated Builders & Contractors of Western Pennsylvania v. Community
    College of Allegheny County*, 81 F.4th 279 (3d Cir. 2023)..............................51

*Barber v. Governor of Alabama*,
    73 F.4th 1306 (11th Cir. 2023) ...........................................................................13

*Biden v. Nebraska*,
    600 U.S. 477 (2023) .............................................................................................45

*Bonner v. City of Prichard*,
    661 F.2d 1206 (11th Cir. 1981) (en banc).........................................................38

*Bradford v. U.S. Department of Labor*,
    101 F.4th 707 (10th Cir. 2024) ....................................................37, 44, 45, 53, 55

*Building & Construction Trades Department v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ...................................................................2, 16, 35

*Centech Group, Inc. v. United States*,
    554 F.3d 1029 (Fed. Cir. 2009) .........................................................................29

*Chamber of Commerce of the United States v. Napolitano*,
    648 F. Supp. 2d 726 (D. Md. 2009)............................................................40, 41

*Christian Labor Association v. City of Duluth*,
    2023 WL 3996240 (D. Minn. June 14, 2023)............................................49, 50

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)..................................................................................41, 43, 44

*Clark Construction Co. v. Pena*,
    895 F. Supp. 1483 (M.D. Ala. 1995) .................................................................23

*Collins & Co., General Contractors v. Claytor*,
    476 F. Supp. 407 (N.D. Ga. 1979)....................................................................23

*Contractors Association of Eastern Pennsylvania v. Secretary of Labor*,
442 F.2d 159 (3d Cir. 1971) ..............................................................37

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
543 U.S. 157 (2004) ..........................................................................43

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*,
601 U.S. 42 (2024) ............................................................................42

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) ..............................................................................53

*Emery Worldwide Airlines, Inc. v. United States*,
264 F.3d 1071 (Fed. Cir. 2001) ........................................................19

*Farkas v. Texas Instrument, Inc.*,
375 F.2d 629 (5th Cir. 1967) ............................................................37

*Feds for Med. Freedom v. Biden*,
581 F. Supp. 3d 826 (S.D. Tex. 2022) ..............................................54

*Florida v. Nelson*,
576 F. Supp. 3d 1017 (M.D. Fla. 2021) ............................................23

*FMS Investment Corp. v. United States*,
144 Fed. Cl. 140 (2019) ....................................................................46

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ..........................................................................53

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ......................... 16, 17, 24, 41, 42, 43, 44

*H.K. Porter Co. v. NLRB*,
397 U.S. 99 (1970) ............................................................................56

*Human Services Council of New York v. City of New York*,
2024 WL 4792004 (S.D.N.Y. Nov. 14, 2024) ..................................49

*Kentucky v. Biden*,
571 F. Supp. 3d 715 (E.D. Ky. 2021) ..............................................56

*Lockheed Missiles & Space Co. v. Bentsen*,
  4 F.3d 955 (Fed. Cir. 1993) ...............................................................45

*Lorillard v. Pons*,
  434 U.S. 575 (1978) ...........................................................................39

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ...............................................37, 38, 44

*Mark Dunning Industries, Inc. v. Perry*,
  890 F. Supp. 1504 (M.D. Ala. 1995) ..................................................23

*Martin v. Wrigley*,
  540 F. Supp. 3d 1220 (N.D. Ga. 2021) ..............................................52

*Mayes v. Biden*,
  67 F.4th 921 (9th Cir. 2023) ...............................................39, 44, 44-45

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ...........................................................36

*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ...........................................................................43

*McKnight Construction Co. v. Perry*,
  888 F. Supp. 1178 (S.D. Ga. 1994) ....................................................23

*Metropolitan Life Insurance Co. v. Massachusetts*,
  471 U.S. 724 (1985) ...........................................................................57

*Motor Vehicle Manufacturers Association of the United States v. State Farm
  Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ....................53

*MVL USA, Inc. v. United States*,
  174 Fed. Cl. 437 (2025) .........................................11, 19, 20, 32, 33
  2025 WL 1318988 (Fed. Cl. May 6, 2025)...............................25, 33

*National Government Services, Inc. v. United States*,
  923 F.3d 977 (Fed. Cir. 2019) ...............................................15, 29, 30

*National Maritime Union of America v. Commander, Military Sealift Command*,
  824 F.2d 1228 (D.C. Cir. 1987) .............................................. 23-24, 31

*Nebraska v. Su,*
    121 F.4th 1 (9th Cir. 2024) ..............................................................45

*Nica Holdings, Inc., In re,*
    810 F.3d 781(11th Cir. 2015) ...........................................................8

*North America's Building Trades Unions v. Department of Defense,*
    2025 WL 1423610 (D.D.C. May 16, 2025) ......................................25

*Northeastern Florida Chapter of the Associated General Contractors of America v.
    City of Jacksonville*, 508 U.S. 656 (1993).................................21, 22

*Northeastern Florida Chapter of the Associated General Contractors of America v.
    City of Jacksonville*, 896 F.2d 1283 (11th Cir. 1990) ........................21

*Reno v. Flores,*
    507 U.S. 292 (1993) .......................................................................34

*Road-Con, Inc. v. City of Philadelphia,*
    120 F.4th 346 (3d Cir. 2024) .....................................................50, 51

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
    547 U.S. 47 (2006) .............................................17, 46, 47, 48, 49

*Sampson v. Murray,*
    415 U.S. 61 (1974) .................................................................21, 22, 23

*Savantage Financial Services, Inc. v. United States,*
    595 F.3d 1282 (Fed. Cir. 2010) ............................................. 31-32, 46

*SEC v. Big Apple Consulting USA, Inc.,*
    783 F.3d 786 (11th Cir. 2015) .....................................................44, 52

*SEC v. Ginsburg,*
    362 F.3d 1292 (11th Cir. 2004) .......................................................28

*Seila Law LLC v. CFPB,*
    591 U.S. 197 (2020) ........................................................................44

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011)..........................................................22

*Sierra Club v. Van Antwerp,*
    526 F.3d 1353 (11th Cir. 2008) ..........................................................54

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) ..............................................................36

*Times LP v. Waldrip,*
    37 F.4th 1386 (8th Cir. 2022) .............................................................50

*UAW-Labor Employment & Training Corp. v. Chao,*
    325 F.3d 360 (D.C. Cir. 2003) .......................................................37, 40

*United Brotherhood of Carpenters & Joiners of America v. Operative Plasterers'*
    *& Cement Masons' International Ass'n*, 721 F.3d 678 (D.C. Cir. 2013) ...........2

*United States v. Mississippi Power & Light Co.,*
    638 F.2d 899 (5th Cir. Unit A Mar. 1981)............................................38

*United States v. New Orleans Public Service, Inc.,*
    553 F.2d 459 (5th Cir. 1977) ..............................................................38

*Weichsel v. JP Morgan Chase Bank, N.A.,*
    65 F.4th 105 (3d Cir. 2023) ................................................................51

*West Virginia v. EPA,*
    597 U.S. 697 (2022)............................................................................44

*White v. School Board of Hillsborough County,*
    2009 WL 174944 (11th Cir. Jan. 27, 2009).........................................52

*Winter v. NRDC,*
    555 U.S. 7 (2008) ...............................................................................13

**Statutes:**

Pub. L. No. 107-217, 116 Stat. 1062 (2002).............................................39

10 U.S.C. § 3206(a)(1)(A) .......................................................................31

28 U.S.C. § 1491(b)(1) ............................................................................19

28 U.S.C. § 1491(b)(2) ...................................................21

40 U.S.C. § 101 ...............................................................39

40 U.S.C. § 101(1) ..........................................................35

40 U.S.C. § 111 ...............................................................36

40 U.S.C. § 121(a) ...........................................32, 36, 39, 42

41 U.S.C. § 107 ..............................10, 18, 19, 28, 29

41 U.S.C. § 113 .............................................11, 19, 29

41 U.S.C. § 1302(a) ..........................................................6

41 U.S.C. § 1707(a)(1) ....................................................55

41 U.S.C. § 3101(a) ........................................................45

41 U.S.C. § 3301(a) ..............................................10, 18, 28

41 U.S.C. § 3306 .............................................................46

41 U.S.C. § 3306(a)(1)(A) ........................................31, 46

41 U.S.C. § 3306(a)(2)(B) ..............................................46

41 U.S.C. § 3703(c) ........................................................45

**Executive Branch Materials:**

48 C.F.R. § 22.504(d)(1)(i) ...............................................7

48 C.F.R. § 22.504(d)(1)(ii) ..............................................7

Exec. Order No. 12,818,
   57 Fed. Reg. 48,713 (Oct. 28, 1992) ....................... 2-3

Exec. Order No. 12,836,
   58 Fed. Reg. 7045 (Feb. 3, 1993) ...............................3

Exec. Order No. 13,201,
   66 Fed. Reg. 11,221 (Feb. 22, 2001) .........................40

Exec. Order No. 13,202,
   66 Fed. Reg. 11,225 (Feb. 22, 2001) ....................................................3

Exec. Order No. 13,502,
   74 Fed. Reg. 6985 (Feb. 11, 2009) ......................................................3

Exec. Order No. 14,063,
   87 Fed. Reg. 7363 (Feb. 9, 2022) ..................................3, 4, 5, 6, 31, 39

Exec. Order No. 14,173,
   90 Fed. Reg. 8633 (Jan. 31, 2025) ....................................................38

88 Fed. Reg. 88,708 (Dec. 22, 2023).................................................7, 55

Memorandum from Russell T. Vought, Director,
   to Heads of Exec. Dep'ts & Agencies (June 12, 2025),
   https://perma.cc/87ZL-SXD4 ..............................................8, 9, 40

Memorandum from Shalanda D. Young, Director to
   Heads of Exec. Dept's & Agencies (Dec. 18, 2023),
   https://perma.cc/8Q4K-CJN9 ......................................................7

Memorandum on Use of Project Labor Agreements for Federal
   Construction Projects, 1997 Pub. Papers 705 (June 5, 1997),
   https://perma.cc/DYJ5-HBKU ......................................................3

**Rule:**

Fed. R. Evid. 201(b) ................................................................8

**Other Authorities:**

*Consistent*, Oxford English Dictionary, https://doi.org/
   10.1093/OED/2753437657 (last visited June 17, 2025) ..............................37

Elena Kagan, *Presidential Administration*,
   114 Harv. L. Rev. 2245 (2001)......................................................54

1B John Cosgrove McBride & Thomas J. Touhey,
   *Government Contracts: Law, Administration & Procedures*,
   LexisNexis (database updated 2025) .............................................45

## STATEMENT OF ISSUES

This case concerns a directive for federal agencies to include in large-scale construction contracts a requirement for contractors and subcontractors to enter project labor agreements (PLAs) with appropriate labor organizations, unless the agencies invoke one of the available exceptions to that requirement. Plaintiffs, who are trade associations that represent construction contractors, challenged the directive. The district court denied a preliminary injunction, concluding that the challenged directive likely violates the Competition in Contracting Act (CICA) but that plaintiffs had failed to show they would suffer irreparable harm from that violation in the absence of an injunction.

The issues presented are:

1. Whether the district court acted within its discretion in determining that plaintiffs had not shown a preliminary injunction was necessary to prevent irreparable harm from the CICA violation the court identified.

2. Whether plaintiffs also failed to establish a likelihood of success on the merits, either on their CICA claim or on other claims.

## STATEMENT OF THE CASE

### A. Project Labor Agreements (PLAs)

"A PLA is a multi-employer, multi-union pre-hire agreement designed to systemize labor relations at a construction site." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002). PLAs "are commonplace in the construction industry because they serve the unique needs of the construction-industry labor market." *United Bhd. of Carpenters & Joiners of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 721 F.3d 678, 693 (D.C. Cir. 2013). A PLA "typically requires that all contractors and subcontractors who will work on a project subscribe to the agreement; that all contractors and subcontractors agree in advance to abide by a master collective bargaining agreement for all work on the project; and that wages, hours, and other terms of employment be coordinated or standardized pursuant to the PLA across the many different unions and companies working on the project." *Allbaugh*, 295 F.3d at 30.

For more than 30 years, presidents have set policy for Executive Branch agencies with respect to the use of PLAs on government construction projects. President George H.W. Bush issued an executive order prohibiting the use of PLAs in federal construction projects. Exec. Order No. 12,818, 57 Fed.

Reg. 48,713 (Oct. 28, 1992). President Clinton revoked that order, Exec. Order No. 12,836, 58 Fed. Reg. 7045 (Feb. 3, 1993), and later issued a memorandum authorizing federal agencies to require the use of PLAs on "large and significant" construction projects where doing so would "advance the Government's procurement interest in cost, efficiency, and quality and in promoting labor-management stability," Memorandum on Use of Project Labor Agreements for Federal Construction Projects, 1997 Pub. Papers 705, 705 (June 5, 1997), https://perma.cc/DYJ5-HBKU. President George W. Bush replaced that memorandum with an executive order barring agencies from either requiring or prohibiting the use of PLAs in federal construction projects. Exec. Order No. 13,202, 66 Fed. Reg. 11,225 (Feb. 22, 2001). And President Obama replaced that executive order with one that "encourage[d] executive agencies to consider requiring the use of [PLAs] in connection with large-scale construction projects." Exec. Order No. 13,502, 74 Fed. Reg. 6985, 6985 (Feb. 11, 2009). That order remained in effect until 2022.

B.    **The Challenged PLA Directive**

1.    In 2022, President Biden issued Executive Order No. 14,063, 87 Fed. Reg. 7363 (Feb. 9, 2022). The executive order explains that "[l]arge-scale

construction projects pose special challenges to efficient and timely procurement by the Federal Government." *Id.* at 7363. For example, "construction projects typically involve multiple employers at a single location," so "a labor dispute involving one employer can delay the entire project," and "[a] lack of coordination among various employers, or uncertainty about the terms and conditions of employment of various groups of workers, can create friction and disputes in the absence of an agreed-upon resolution mechanism." *Id.* President Biden determined that "[t]hese problems threaten the efficient and timely completion of construction projects undertaken by Federal contractors." *Id.*

President Biden further determined that PLAs "are often effective in preventing these problems from developing because they provide structure and stability to large-scale construction projects." 87 Fed. Reg. at 7363. For example, President Biden determined, PLAs can "avoid labor-related disruptions on projects by" prescribing "dispute-resolution processes … and by prohibiting work stoppages, including strikes and lockouts." *Id.*

President Biden accordingly declared that "it is the policy of the Federal Government for agencies to use [PLAs] in connection with large-scale

construction projects to promote economy and efficiency in Federal procurement." 87 Fed. Reg. at 7363. With exceptions discussed below, he directed agencies "awarding any contract in connection with a large-scale construction project, or obligating funds pursuant to such a contract," to "require every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a [PLA] with one or more appropriate labor organizations." *Id.* at 7364. The executive order specified that PLAs for such contracts should, among other things, "contain guarantees against strikes, lockouts, and similar job disruptions" and "set forth effective, prompt, and mutually binding procedures for resolving labor disputes arising during the term of the … agreement." *Id.* The executive order also specified that agencies should "allow all contractors and subcontractors on the construction project to compete for contracts and subcontracts without regard to whether they are otherwise parties to collective bargaining agreements." *Id.*

The executive order recognized, however, that PLAs may be inappropriate for certain projects: those that are "of short duration and lack[] operational complexity," that "involve only one craft or trade," that "will involve specialized construction work that is available from only a limited number

of contractors or subcontractors," or that present such "unusual and compelling urgency that a [PLA] would be impracticable." 87 Fed. Reg. at 7364. The executive order thus allowed agencies to exempt a project from the PLA requirement by finding one or more of those circumstances to be present. *Id.* The executive order also allowed agencies to exempt a project by determining that requiring a PLA "would substantially reduce the number of potential bidders so as to frustrate full and open competition" or "would otherwise be inconsistent with statutes, regulations, Executive Orders, or Presidential Memoranda." *Id.*

The executive order directed the Federal Acquisition Regulation (FAR) Council to issue implementing regulations after public notice and comment. 87 Fed. Reg. at 7365. The FAR Council is a body—comprised of officials from the Office of Federal Procurement Policy in the Office of Management and Budget (OMB), the Department of Defense, the National Aeronautics and Space Administration, and the General Services Administration—that "assist[s] in the direction and coordination of Government-wide procurement policy and" associated regulations. 41 U.S.C. § 1302(a). The executive order also instructed the Director of OMB to issue guidance on exceptions from the PLA requirement. 87 Fed. Reg. at 7365.

The FAR Council agencies issued their implementing regulations in December 2023, 88 Fed. Reg. 88,708 (Dec. 22, 2023), and OMB contemporaneously issued guidance regarding exceptions, Memorandum from Shalanda D. Young, Director to Heads of Exec. Dept's & Agencies (Dec. 18, 2023), https://perma.cc/8Q4K-CJN9.  The regulations state that agencies may exempt a contract from the PLA requirement if "[r]equiring a [PLA] on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement," for one or more of the reasons identified in the executive order.  48 C.F.R. § 22.504(d)(1)(i).  Consistent with the executive order, the regulations also allow exemptions where "[m]arket research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved."  *Id.* § 22.504(d)(1)(ii).  And the regulations allow exemptions where requiring a PLA "would otherwise be inconsistent with Federal statutes, regulations, Executive orders, or Presidential memoranda." *Id.* § 22.504(d)(1)(iii).  The regulations took effect on January 22, 2024.  88 Fed. Reg. at 88,708.

This brief refers to the executive order, as implemented by the FAR Council's regulations and OMB guidance, as the "PLA directive."

2. In recent weeks, OMB issued a new guidance memorandum amending the one it had issued in December 2023. Memorandum from Russell T. Vought, Director, to Heads of Exec. Dep'ts & Agencies (June 12, 2025), https://perma.cc/87ZL-SXD4 (Vought Memorandum). This Court can and should take judicial notice of the content of the new guidance. *See, e.g.*, *In re Nica Holdings, Inc.*, 810 F.3d 781, 785 n.3 (11th Cir. 2015) (this Court is "'free to take judicial notice of subsequent developments in cases that are a matter of public record and are relevant to the appeal'"); Fed. R. Evid. 201(b).

The new guidance states that the current "Administration supports the use of PLAs when those agreements are practicable and cost effective" and that "blanket deviations prohibiting the use of PLAs" in certain types of contracts "are precluded." Vought Memorandum 1. The primary change from the prior OMB guidance concerns the exception to the PLA directive that applies "when market research indicates that requiring a PLA on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be

achieved." *Id.*  The prior OMB guidance stated that that exception is generally inapplicable if there are "two or more qualified offers … for negotiated contracts" or "three or more qualified bids … for sealed bids." *Id.*  The new guidance clarifies that that rule of thumb is "[s]ubject to the particular findings of market research, including market conditions in the specific geographic region where the construction project is planned." *Id.* at 2.  It also states that if market research suggests prices will exceed "the government's budget by more than 10 percent due to the PLA requirement, the agency may use [that] finding to support a determination that fair and reasonable pricing cannot be achieved," such that a project-specific exemption is appropriate. *Id.*

## C.   This Litigation

Plaintiffs are trade associations that represent construction companies, some of which regularly perform contracts for the federal government.  They brought this suit in late March 2024, more than two months after the implementing regulations took effect.  Dkt. 1.  They claim that the PLA directive exceeds the authority conferred by the Federal Property and Administrative Services Act and violates CICA, the Office of Federal Procurement Policy

Act, the First Amendment, the National Labor Relations Act, and the Administrative Procedure Act (APA). *Id.* at 33-47.

Plaintiffs waited nearly a month more before moving for a preliminary injunction in late April 2024. While that motion was pending, the parties filed cross-motions for summary judgment, which have been fully briefed since October 2024.

In March 2025, the district court denied plaintiffs' motion for a preliminary injunction, without ruling on the pending cross-motions for summary judgment. Dkt. 58. The court concluded that plaintiffs were likely to prevail on their claim that the PLA directive violates CICA. That statute states as relevant that, with exceptions inapplicable here, "an executive agency in conducting a procurement for property or services shall … obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a). A related provision defines "full and open competition" to "mean[] that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." *Id.* § 107. And a third provision defines "responsible source" to "mean[] a prospective contractor that"

> (1) has adequate financial resources to perform the contract or the ability to obtain those resources;

(2) is able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and Government business commitments;

(3) has a satisfactory performance record;

(4) has a satisfactory record of integrity and business ethics;

(5) has the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain the organization, experience, controls, and skills;

(6) has the necessary production, construction, and technical equipment and facilities, or the ability to obtain the equipment and facilities; and

(7) is otherwise qualified and eligible to receive an award under applicable laws and regulations.

*Id.* § 113. The district court was "persua[ded]," Dkt. 58 at 11, by the recent decision of the Court of Federal Claims in *MVL USA, Inc. v. United States* (*MVL I*), 174 Fed. Cl. 437 (2025). There, the Court of Federal Claims held—"in the context of specific bid protests"—that particular solicitations incorporating a PLA requirement were invalid under CICA because they "excluded offerors regardless of their ability to perform the contract even when market research suggested that the inclusion of a PLA requirement in the solicitation would reduce competition, economy, and efficiency and increase price." Dkt. 58 at 10-11 (discussing *MVL I*, 174 Fed. Cl. at 441, 453-454).

The district court here denied a preliminary injunction, however, because it concluded that plaintiffs had not shown they would suffer irreparable harm, absent an injunction, from the CICA violation that the court identified. The court determined that members of the plaintiff associations who bid on federal contracts would "have adequate relief through individual bid protests before the Court of Federal Claims," as in *MVL I*. Dkt. 58 at 16. Plaintiffs failed, the court explained, to "provide any evidence, argument, or legal authority for the proposition that individual protests would be inadequate to remedy the harms in this case." *Id.* And with respect to members of the plaintiff associations that have historically been engaged as subcontractors on federal projects, the court found "only speculative and conclusory" evidence of irreparable harm, dependent on "a number of future contingencies that may or may not occur." *Id.* at 17-18.

The district court did not determine whether plaintiffs were likely to succeed on the merits of any of their claims other than the CICA claim. *See* Dkt. 58 at 9 (determining that plaintiffs had not "adequately briefed" their claim that the PLA directive exceeds the President's authority under the Federal Property and Administrative Services Act); *id.* at 13 n.3 ("declin[ing] to address the merits of the remaining claims").

## D. Standard of Review

This Court "review[s] a district court's decision to deny a preliminary injunction for abuse of discretion." *Barber v. Governor of Alabama*, 73 F.4th 1306, 1316 (11th Cir.), *cert. denied sub nom. Barber v. Ivey*, 143 S. Ct. 2545 (2023). Under that standard, the Court reviews the district court's "'findings of fact … for clear error and legal conclusions *de novo*.'" *Id.* The Court will reverse "'only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect.'" *Id.*

## SUMMARY OF ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The district court did not abuse its discretion in concluding that plaintiffs here failed to show irreparable harm from the CICA violation the court identified. And plaintiffs are unlikely to succeed on the merits of any of their other claims—an issue this Court can resolve in the first instance. This Court should therefore affirm the denial of a preliminary injunction.

I.     The district court correctly determined that plaintiffs failed to show they would suffer irreparable harm, absent an injunction, from the CICA violation that the court identified.  At a minimum, that ruling was not an abuse of the district court's discretion.

A.     By their nature, CICA violations are specific to particular solicitations.  The district court correctly concluded that if members of the plaintiff associations wish to bid on solicitations that contain PLA requirements in violation of CICA, they can effectively protect themselves against those violations by filing bid protests in the Court of Federal Claims, as happened in *MVL I*.  There is accordingly no basis to believe that a preliminary injunction is necessary to protect prospective bidders against harm from CICA violations.

B.     The district court was equally within its discretion to conclude that the subcontractor members of the plaintiff associations failed to establish irreparable harm.  As the court explained, any prospect of irreparable harm for subcontractors would rest on a long series of speculative contingencies.  The court correctly declined to grant preliminary injunctive relief on the basis of speculation about the need for it.

II.    Plaintiffs also failed to establish a likelihood of success on any claim.

A.    The PLA directive is consistent with CICA because it allows "all responsible sources" for the construction contracts at issue to bid on those contracts.  If a contractor cannot comply with a PLA requirement in a solicitation, it is not a responsible source.  And if it can comply, then it is free to bid on the solicitation; its choice not to do so does not constitute a CICA violation.  The district court's contrary view rested on *National Government Services, Inc. v. United States*, 923 F.3d 977 (Fed. Cir. 2019), but the policy held invalid in that case violated CICA because it did not address the government's procurement needs.  The PLA directive here, by contrast, is meant to satisfy the government's procurement needs.  Agencies have broad discretion to determine their needs, and this directive simply instructs them as to what they should consider to be their needs for a given set of contracts.

In any event, even if some solicitations subject to the PLA directive might in theory violate CICA, the directive on its face does not.  The district court concluded that plaintiffs were likely to show that the PLA directive is facially invalid because the court believed that agencies are not applying the available exceptions to the directive with sufficient rigor.  To the extent that

belief is accurate, it would be appropriate for consideration only in an as-applied challenge and does not justify a preliminary injunction against the directive on its face. The proper remedy would be solicitation-specific relief in the Court of Federal Claims, as awarded in *MVL I*.

B.    The PLA directive is within the President's power to issue.

The D.C. Circuit upheld a prior executive order with respect to PLAs on the ground that the President has inherent constitutional authority to direct agencies as to how they should exercise their contracting powers. *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32-34 (D.C. Cir. 2002). The directive challenged here is valid on the same basis.

Alternatively, the directive is a proper exercise of the President's statutory authority under the Federal Property and Administrative Services Act. Courts have long understood the Act to provide the President with broad and flexible authority to issue directives he regards as advancing economy and efficiency in federal procurement. The PLA directive easily passes muster under that standard.

The district court found persuasive a narrower construction of the Act previously embraced by a single judge of this Circuit in *Georgia v. President of the United States*, 46 F.4th 1283, 1292-1301 (11th Cir. 2022) (opinion of Grant,

J.); *see id.* at 1308 (Edmondson, J., concurring only in the result); *id.* (Anderson, J. dissenting in relevant part).  But that interpretation is inconsistent with the longstanding views of all three branches of government and with basic principles of statutory interpretation.  In any event, the directive would comport with even that narrower interpretation.

C.     The PLA directive is also consistent with the First Amendment. Like the policy upheld in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47 (2006), the directive neither restricts nor requires contractors' speech, and it does not require them to associate with unions in a constitutionally problematic way.

D.     Plaintiffs' remaining claims are also meritless.  Executive orders are not subject to the reasoned-decisionmaking requirements of the APA because the President is not an agency within the meaning of the APA.  Neither are agency actions implementing determinations that Congress has vested directly in the President.  In any event, the rule implementing the PLA directive would pass arbitrary-and-capricious review if it were applicable, including as to the decisionmaking requirements set forth in the Small Business Act and Regulatory Flexibility Act.  Finally, OMB's guidance memorandum is not subject to the notice-and-comment requirement of the Office of

Federal Procurement Policy Act, and the PLA directive is consistent with Section 8(d) of the National Labor Relations Act.

## ARGUMENT

## I. The District Court Acted Within Its Discretion In Determining That Plaintiffs Had Failed To Show Irreparable Harm

### A. CICA Violations In Particular Solicitations Can Be Remedied Through Bid Protests

The district court correctly concluded that if members of the plaintiff associations wish to bid on solicitations that contain PLA requirements in violation of CICA, they can effectively protect themselves against those violations by filing bid protests in the Court of Federal Claims. At a minimum, that ruling was not an abuse of the district court's discretion.

1. By their nature, CICA violations are specific to particular solicitations. CICA sets requirements for the conduct of a given "procurement," prescribing that agencies "conducting a procurement" must "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a). That requirement is satisfied if agencies allow "all responsible sources … to submit sealed bids or competitive proposals on the procurement." *Id.* § 107. And whether a company is a "responsible source" depends on a host of fact-intensive considerations specific to a given procurement—

for example, whether the company "has adequate financial resources to perform the contract" and has "the necessary production, construction, and technical equipment and facilities" to do so. *Id.* § 113. Thus, one cannot determine whether CICA has been violated without identifying the range of "responsible sources" for a particular procurement and whether "all" of those "responsible sources" were permitted "to submit sealed bids or competitive proposals on the procurement," *id.* § 107.

If a contractor believes that a given solicitation contains terms inconsistent with CICA, the contractor's recourse is to bring a bid protest in the Court of Federal Claims. *See* 28 U.S.C. § 1491(b)(1) (giving the Court of Federal Claims and district courts "jurisdiction to render judgment on an action by an interested party objecting to … any alleged violation of statute or regulation in connection with a procurement or a proposed procurement"); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) (explaining that "Congress enacted a sunset provision, which terminated federal district court jurisdiction over bid protests on January 1, 2001"). That is what happened in *MVL USA, Inc. v. United States* (*MVL I*), 174 Fed. Cl. 437 (2025), on which the district court relied: Construction companies protested

particular solicitations, arguing that the inclusion of PLA requirements in those solicitations violated CICA among other statutes.

*MVL I* illustrates the highly fact-specific nature of CICA violations. In resolving the bid protests before it, the Court of Federal Claims did not pass judgment on the PLA directive in the abstract. Rather, it addressed "whether the individual solicitations provide[d] for full and open competition 'in light of' the PLA requirements mandated by the" directive. 174 Fed. Cl. at 463. In doing so, it surveyed the circumstances of the various solicitations, *id.* at 464-467, and concluded that "[t]he record evidence for" those solicitations showed that agencies would "exclude an otherwise responsible offeror under the" challenged directive, "regardless of that offeror's capability to perform the contract," *id.* at 469 (emphasis omitted). The court's bottom-line conclusion was that the PLA directive was unlawful as applied "to the substance of the solicitations at issue." *Id.* at 470. And the remedy the court ordered was for the agencies in question to "reassess their PLA decision" for each of the solicitations at issue "on an individual basis." *Id.* at 474.

In the future, any member of the plaintiff associations that wishes to bid on a solicitation containing a PLA requirement pursuant to the challenged directive (and that is otherwise qualified to perform the work) can

protest that solicitation in the Court of Federal Claims. If that court concludes that the PLA requirement in the solicitation causes it to violate CICA, the company can obtain declaratory and injunctive relief with respect to that solicitation. 28 U.S.C. § 1491(b)(2).

There is accordingly no basis to believe that a preliminary injunction is necessary to protect prospective bidders against harm from CICA violations. This Court has long recognized that the availability of other forms of "'corrective relief … weighs heavily against a claim of irreparable harm'" in the absence of a preliminary injunction. *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Here, there is not just a "'possibility'" of such alternative relief, *id.*, but a certainty that prospective bidders can obtain it against solicitations that contain a PLA requirement in violation of CICA.

2.      Plaintiffs' contrary arguments are meritless.

Plaintiffs rely principally on the Supreme Court's decision in *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993). There, the Supreme Court held that an association of contractors could establish standing to challenge an "ordinance

- 21 -

accord[ing] preferential treatment to certain minority-owned businesses," without showing that "one of its members would have received a contract absent the ordinance," on the ground that "the inability to compete on an equal footing in the bidding process" is an injury sufficient to satisfy Article III. *Id.* at 658, 666. But as the district court noted, that decision addressed standing, not irreparable harm, Dkt. 58 at 16, and the showing necessary to establish an Article III injury is much lower than the showing necessary to establish irreparable harm absent a preliminary injunction. In *Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011), for example, the D.C. Circuit held that even though the plaintiffs had standing to challenge a policy allowing funding for embryonic-stem-cell research—because they "compete[d] with [embryonic-stem-cell] researchers for funding"—the balance of equities did not favor a preliminary injunction because it was uncertain "whether invalidating the" policy would actually cause the plaintiffs to receive "more grant money." *Id.* at 398.

As the Supreme Court has explained, moreover, "'[t]he key word in'" the requirement of irreparable harm "'is *irreparable*.'" *Sampson*, 415 U.S. at 90. Even where injuries are certain and concrete, they "'are not enough'" to satisfy the irreparable-harm requirement where there is a "'possibility that

adequate compensatory or other corrective relief will be available at a later date.'" *Id.* And as discussed above, a bid protest would provide adequate "'corrective relief,'" *id.*, to obviate the need for a preliminary injunction even if plaintiffs were likely to prevail on the merits.

The other cases plaintiffs invoke are no more helpful to them. Most of the cases apply the rule that "monetary relief" to allow the "recovery of bid preparation costs[] is insufficient to compensate an unsuccessful bidder for the wrongful award of a government procurement contract." *Mark Dunning Indus., Inc. v. Perry*, 890 F. Supp. 1504, 1517 (M.D. Ala. 1995); *see Florida v. Nelson*, 576 F. Supp. 3d 1017, 1039 (M.D. Fla. 2021); *Clark Constr. Co. v. Pena*, 895 F. Supp. 1483, 1493 (M.D. Ala. 1995); *McKnight Constr. Co. v. Perry*, 888 F. Supp. 1178, 1184-1185 (S.D. Ga. 1994); *Collins & Co., Gen. Contractors v. Clay-tor*, 476 F. Supp. 407, 410 (N.D. Ga. 1979). But plaintiffs here are not seeking "compensat[ion]" for "the wrongful award of a government procurement contract," *Mark Dunning*, 890 F. Supp. at 1517; they are seeking to ensure, going forward, that they will not be subjected to contracting requirements they allege are legally invalid. One of plaintiffs' cases itself distinguishes between the "economic loss of [a] contract" and the "right to a legally valid procurement process," *National Mar. Union of Am. v. Commander, Mil. Sealift*

*Command*, 824 F.2d 1228, 1237 (D.C. Cir. 1987); this case involves the latter, not the former. And there is no doubt that a bid protest can (if successful) vindicate plaintiffs' asserted right to avoid legally invalid contracting requirements. That is what happened in *MVL I*.

Plaintiffs also briefly suggest (Br. 21) that "regardless of whether [they] took advantage of bid protest options, [they] and their members would … need[] to spend time complying with" what they characterize as "the PLA mandate." That is incorrect. There is no question that contractors can incur certain costs if they actually enter PLAs or bid on contracts requiring PLAs. That is the point made by the declarations on which plaintiffs rely. *See* Dkt. 18-7 at 6 ¶ 16; Dkt. 18-11 at 5-6 ¶¶ 11-13; Dkt. 18-12 at 4 ¶ 10. But a successful bid protest would relieve plaintiffs of those costs by obviating the need for them to enter PLAs or bid on solicitations requiring PLAs. A single-judge opinion concluding that unrecoverable compliance costs can constitute irreparable harm, *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022) (opinion of Grant, J.); *see id.* at 1308 (Edmondson, J., concurring only in the result); *id.* (Anderson, J. dissenting in relevant part), therefore does not help plaintiffs: If their CICA claims are meritorious, they can avoid incurring unrecoverable compliance costs by filing bid protests.

Finally, plaintiffs err in suggesting (Br. 23) that recent decisions in related matters have "exacerbated [their] irreparable harm." The *MVL* court's decision not to enjoin the enforcement of the PLA directive, *MVL USA, Inc. v. United States* (*MVL II*), 2025 WL 1318988 (Fed. Cl. May 6, 2025), does not, as plaintiffs suggest, show "that bid protests are *not* an adequate remedy" (Br. 23). As discussed above, the *MVL* court granted solicitation-specific relief—exactly the kind of relief that would protect plaintiffs against irreparable harm, during the pendency of this litigation, if their claims were meritorious. The court simply declined to issue a broader injunction, which plaintiffs can seek in this case if they prevail at summary judgment. And the recent ruling in *North America's Building Trades Unions v. Department of Defense*, 2025 WL 1423610 (D.D.C. May 16, 2025), does not prevent agencies from applying the exceptions to the PLA directive; it simply sets aside two memoranda categorically excepting certain contracts from the PLA directive. (OMB's recent guidance makes clear that "blanket deviations" of this nature "are precluded" going forward. Vought Memorandum 1.)

**B.    There Is No Basis To Believe Any Subcontractor Member
Of The Plaintiff Associations Faces Irreparable Harm**

The district court was equally correct—and certainly within its discretion—to conclude that the subcontractor members of the plaintiff associations failed to establish irreparable harm.

As the district court explained, a finding of irreparable harm for subcontractors would rest on a long chain of speculative contingencies:

- first, "that these subcontractors would be able and willing to perform on projects subject to" the PLA directive;

- second, that they "would be selected by a successful general contractor to do so"; and

- third, that the PLA directive would prevent that from happening—either

    - because "the wrong union [would] be used to negotiate the PLA," as opposed to a union that the subcontractors had worked with in the past; or

    - because "the PLA's terms [would] otherwise make performance impossible"; or

    - because "the contractor that would have selected them … [would] not bid for or be awarded" contracts subject to the directive; or

    - because "the contractor that wins the bid [would] be unionized and, therefore, unwilling to work with" the subcontracts in question.

Dkt. 58 at 17-18.  None of that is impossible, but as the district court observed, it all amounts to a series of "contingencies that may or may not occur."  *Id.* at 18.  The court could not find irreparable harm based on those contingencies without "rely[ing] on speculation regarding the actions or inactions of third-parties."  *Id.*  Plaintiffs identify no basis for this Court to reject the district court's assessment of those facts as an abuse of its discretion.

Plaintiffs' suggestion (Br. 21-22) that the district court "ignored additional harms identified by the subcontractors" is equally mistaken.  The supposedly ignored harms are compliance costs, such as the cost of "accurately estimat[ing]" expenses for a given project.  Br. 21.  But as discussed above a successful bid protest would obviate the need for prime contractors to enter PLAs or bid on solicitations requiring PLAs.  So the prospect of compliance costs for subcontractors is just as speculative as the prospect of the other costs they have identified.

\*       \*       \*

In short, plaintiffs identify no basis to conclude that the district court abused its discretion in determining that they had not shown irreparable harm, absent a preliminary injunction, from the CICA violation the district court identified.

## II. Plaintiffs Also Failed To Establish A Likelihood Of Success On The Merits Of Any Claim

Plaintiffs also failed to establish a likelihood of success on any claim. The district court's analysis of the CICA claim was erroneous, and plaintiffs' other claims are also meritless. Although the district court did not reach the merits as to any claim other than the CICA claim, this Court can and should do so to provide appropriate clarity for the remainder of this litigation. *See, e.g.*, *SEC v. Ginsburg*, 362 F.3d 1292, 1301 (11th Cir. 2004) (this Court can "decide … in the first instance" preserved "legal issues over which [it] would exercise *de novo* review" if the district court had resolved them).

### A. The Challenged Directive Does Not Violate CICA

1. As discussed above, CICA sets requirements for the conduct of a given "procurement," prescribing that agencies "conducting a procurement" must "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a). That requirement is satisfied if agencies allow "all responsible sources … to submit sealed bids or competitive proposals on the procurement." *Id.* § 107. And whether a company is a "responsible source" depends on facts specific to a given procurement, like

whether the company "has adequate financial resources to perform the contract" and "the necessary production, construction, and technical equipment and facilities" to do so. *Id.* § 113.

The challenged directive is consistent with CICA because it allows "all responsible sources" for the construction contracts at issue to bid on those contracts, 41 U.S.C. § 107. If a contractor cannot comply with a PLA requirement in a solicitation, because for some reason it is not able to enter a PLA, then it is not a responsible source because it lacks the "apparent ability and capacity to perform all contract requirements." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009). If a contractor is able to enter a PLA but simply does not wish to do so, then it is a responsible source (assuming it is otherwise able to perform the contract), but it is also perfectly free to bid on the solicitation. Its choice not to do so does not constitute a CICA violation.

The district court's contrary reasoning rested on the Court of Federal Claims's decision in *MVL I*, which in turn rested on the Federal Circuit's decision in *National Government Services, Inc. v. United States* (*NGS*), 923 F.3d 977 (Fed. Cir. 2019). But *NGS* does not support the district court's conclu-

sion.  In that case, the Federal Circuit addressed a policy by which the Centers for Medicare & Medicaid Services, with the goal of ensuring "'a dynamic, competitive marketplace,'" refused to award more than a certain proportion of the national workload for Medicare claims contractors to a particular entity.  *Id.* at 980.  The crucial feature of that policy, the Federal Circuit explained, was that it excluded companies from being awarded certain contracts for a reason—the desire to preserve a nationally competitive marketplace—having nothing to do with the companies' actual ability to perform the contracts.  The Federal Circuit distinguished the many cases holding that "solicitation requirement[s]" are "not necessarily objectionable" under CICA "simply because" they "ha[ve] the effect of excluding certain offerors who cannot satisfy th[e] requirement[s]," explaining that the Medicare "workload caps"—unlike those run-of-the-mill requirements—were "not requirements tailored to meet [the agency's] needs."  *Id.* at 985-986.

The directive challenged here, unlike the one in *NGS*, plainly addresses the government's needs in the procurements that it covers—namely those for large-scale construction projects.  The challenged executive order explains that such "projects pose special challenges to efficient and timely procurement by the Federal Government," such as the potential for "labor

dispute[s] involving one employer [to] delay the entire project," and that "[t]hese problems threaten the efficient and timely completion of construction projects undertaken by Federal contractors." 87 Fed. Reg. at 7363. And President Biden determined that PLAs "are often effective in preventing these problems from developing," including because they can "avoid labor-related disruptions" by prescribing "dispute-resolution processes … and by prohibiting work stoppages, including strikes and lockouts." *Id.* The challenged directive thus constitutes a determination that PLAs are presumptively necessary "to meet [the government's] needs for" a particular category of procurements, *NGS*, 923 F.3d at 986. It bears no resemblance to the policy challenged in *NGS*, which was issued for a wholly different purpose.

To the extent the district court believed that the PLA directive was not a reasonable determination of the government's needs, that was erroneous. Agencies have authority to "specify [their] needs," 41 U.S.C. § 3306(a)(1)(A); 10 U.S.C. § 3206(a)(1)(A), and to "include restrictive provisions or conditions" in solicitations "to the extent necessary to satisfy [those] needs," 41 U.S.C. § 3306(a)(2)(B); 10 U.S.C. § 3206(a)(2)(B). They possess "'broad discretion'" in making those determinations. *Savantage Fin. Servs., Inc. v. United*

*States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010). Indeed, plaintiffs have not disputed that it can be proper for agencies, in the exercise of their own contracting authorities, to determine that a PLA is an appropriate requirement for a given construction project. And the challenged directive simply instructs agencies as to what they should consider to be needs for a given set of contracts. As further discussed below, that sort of government-wide directive is within both the President's constitutional power to superintend the operations of the Executive Branch and his statutory power to "prescribe policies and directives" for contracting, 40 U.S.C. § 121(a).

2. In any event, even if some solicitations subject to the PLA directive might in theory violate CICA, there is no basis to accept plaintiffs' CICA challenge to the directive on its face.

In *MVL I*, the Court of Federal Claims concluded—on the basis of "[t]he record evidence for" the particular "solicitations" before it—that the PLA directive was having the same problematic effect as the policy at issue in *NGS*: It was causing agencies to "exclude an otherwise responsible offeror … regardless of that offeror's capability to perform the contract." 174 Fed. Cl. at 469 (emphasis omitted). But whether or not that analysis was correct, the court did not suggest—nor could it plausibly have suggested—that the

challenged directive violated CICA on its face.  Rather, the court's analysis turned on its view that the agencies had improperly "ignore[d] the PLA exceptions" in applying the executive order and regulations to the particular solicitations in question.  *Id.*  And its remedy, correspondingly individualized, was to remand for the agencies to "reassess" their "PLA decision" for each of the solicitations at issue "on an individual basis."  *Id.* at 474.  As noted above, the same court later declined to enjoin the application of the PLA directive on its face.  *MVL II*, 2025 WL 1318988.

The district court here, by contrast, concluded that plaintiffs were likely to show that the PLA directive is *facially* invalid—such that agencies could have been enjoined against following it in *all* circumstances, had plaintiffs satisfied the equitable requirements for a preliminary injunction.  That reasoning misunderstands both *MVL I* and the requirements of CICA.  As discussed above, it is plainly proper for the government to determine that PLAs are generally in its interest for large-scale construction projects, while allowing for exemptions when an agency determines that a PLA is not appropriate for a given project.  If agencies fail to apply exemptions when they should, the proper remedy is solicitation-specific relief in the Court of Federal Claims, not an injunction against the PLA directive on its face.  *See, e.g.,*

*Reno v. Flores*, 507 U.S. 292, 301 (1993) ("[t]o prevail in" a "facial challenge" to a regulation, plaintiffs "'must establish that no set of circumstances exists under which the regulation would be valid'" (brackets omitted)).

## B. The PLA Directive Is Within The President's Constitutional And Statutory Authority

Plaintiffs are also incorrect to contend (Br. 24-27) that the PLA directive falls outside the President's authority under the Federal Property and Administrative Services Act, known as FPASA or the Procurement Act.

1. As an initial matter, it is unnecessary for the Procurement Act to supply authority for the challenged directive. Regardless of whether the PLA directive is statutorily authorized by the Act, it is independently within the President's inherent constitutional power to superintend the operations of the Executive Branch (subject to constitutionally valid constraints imposed by Congress).

As noted above, plaintiffs have not disputed that it can be proper for agencies, in the exercise of their own contracting authorities, to determine that a PLA is an appropriate requirement for a given construction project. Plaintiffs dispute only the propriety of the President's government-wide directive to that effect. But as the D.C. Circuit explained in sustaining a prior

executive order regarding PLAs, Article II vests the President with "'general administrative control of those executing the laws' throughout the Executive Branch of government, of which he is the head." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (citation omitted). The D.C. Circuit concluded that the prior directive—which "provide[d] that the Government [would] neither require nor prohibit the use of a PLA on any federal or federally funded construction project"—fell within the President's inherent power because it simply "direct[ed] his subordinates how to proceed in administering federally funded projects" within other statutory constraints. *Id.* at 30, 33. Exactly the same is true of the directive challenged here. The Court therefore need not reach the question whether the Procurement Act supports the directive.

2.    In any event, the PLA directive does fall within the authority conferred by the Procurement Act.

a.    The Procurement Act serves "to provide the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. § 101(1). Its operative provision empowers

the President to "prescribe policies and directives that [he] considers necessary to carry out this subtitle" as long as the directives are "consistent with this subtitle." *Id.* § 121(a). "[T]his subtitle," defined by 40 U.S.C. § 111, includes authorities for procurement and property management.

By its plain terms, § 121(a) gives the President broad discretion to direct agencies' performance of their contracting functions. The word "necessary" has a range of meanings, but "it frequently imports no more than that one thing is convenient, or useful, or essential to another." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819). And that interpretation is appropriate here given Congress's authorization for the President to act as he "*considers* necessary," 40 U.S.C. § 121(a) (emphasis added). *See, e.g.*, *Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) (statute providing that EPA "'may' make changes that it 'deems necessary'" effectively "delegated discretionary authority to EPA to determine when adjustments should be made"). As a textual matter, § 121(a) thus authorizes directives that the President considers useful to guide agencies in carrying out the functions covered by "this subtitle," as long as they are "consistent with" the provisions of "this subtitle." And directives are "consistent with" those provisions if they are "compati-

ble" with those provisions, including the objectives articulated in § 101. *Consistent*, Oxford English Dictionary, https://doi.org/10.1093/OED/2753437657 (last visited June 17, 2025).

Courts have long recognized that this statutory text gives the President "necessary flexibility and 'broad-ranging authority'" in determining contracting policies. *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003); *see also, e.g.*, *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 170 (3d Cir. 1971) ("broad grant of procurement authority"); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) ("broad authority"). They have "generally landed on a 'lenient' standard" for reviewing directives under the Procurement Act. *Louisiana v. Biden*, 55 F.4th 1017, 1026 (5th Cir. 2022) (quoting *Chao*, 325 F.3d at 367). Under that standard, courts "have respected the President's judgment as to how a given executive order is likely to advance the statute's objectives." *Bradford v. U.S. Department of Labor*, 101 F.4th 707, 721 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025). And they have understood those objectives to "'encompass'" numerous "'factors'" — including not just "'price'" but "'quality'" — that affect the value the government obtains from a given contract. *Id.* (quoting *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979) (en banc)).

Applying that broad understanding of the Procurement Act, Presidents of both parties have adopted a wide range of directives to manage federal procurement and contracting, including many that address contractors' labor relations. *See Louisiana*, 55 F.4th at 1023-1026. And courts have upheld nearly all such directives. To cite just one example, this Court's predecessor upheld an executive order (recently rescinded by President Trump) that "impose[d] on government contractors the obligation to take affirmative action to achieve … equal opportunity goals." *United States v. Mississippi Power & Light Co.*, 638 F.2d 899, 901 (5th Cir. Unit A Mar. 1981); *see United States v. New Orleans Pub. Serv., Inc.* (*NOPSI*), 553 F.2d 459 (5th Cir. 1977), *vacated*, 436 U.S. 942 (1978); Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025) (rescission). The Court held in *NOPSI* that the government had "correctly iden-tifie[d] three sources of legislative authorization for the" order, of which the Procurement Act was one, 553 F.2d at 466-467, and reaffirmed in *Mississippi Power & Light* that the order was "firmly rooted in congressionally delegated authority," 638 F.2d at 905. These decisions of the former Fifth Circuit are precedential here. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Congress, too, has ratified the construction of the statute long embraced by the Executive and Judicial Branches. *See Mayes v. Biden*, 67 F.4th 921, 938 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). Congress "is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), as Congress did here in 2002. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law[.]").

b.     The challenged PLA directive falls well within that longstanding construction of the Procurement Act. As discussed above, President Biden determined that "[l]arge-scale construction projects pose special challenges to efficient and timely procurement by the Federal Government" and that PLAs "are often effective in preventing these problems from developing." 87 Fed. Reg. at 7363. For that reason, he directed "agencies to use [PLAs] in connection with large-scale construction projects to promote economy and efficiency in Federal procurement," except in certain scenarios where a PLA would *not* advance economy and efficiency. 87 Fed. Reg. at 7363-7364. And

the current Administration likewise "supports the use of PLAs when [they] are practicable and cost effective."  Vought Memorandum 1.

This is quintessentially the sort of directive that Presidents have routinely issued, and courts have routinely sustained, under the Procurement Act.  In *Chao*, for example, the D.C. Circuit upheld an executive order requiring contractors to post notices of certain labor rights, on the basis of President George W. Bush's judgment that "'[w]hen workers are better informed of their rights, … their productivity is enhanced,'" and that "'[t]he availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts.'"  325 F.3d at 366 (quoting Exec. Order No. 13,201, 66 Fed. Reg. 11,221, 11,221 (Feb. 22, 2001)).  The court did so even as it recognized that "[t]he link" asserted by the President might "seem attenuated" and that one could "with a straight face advance an argument claiming opposite effects or no effects at all."  *Id.* at 366-367.  For similar reasons, the court in *Chamber of Commerce of the United States v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009), upheld an executive order by President Bush requiring that federal contractors use the E-Verify system to determine employment eligibility.  The court held that

the President's justification for the order was sufficient as long as it was "reasonable and rational," whether or not the court agreed with it. *Id.* at 738.

c. The district court expressed skepticism as to whether the Procurement Act authorizes the challenged directive, but it did so only by relying on the interpretation of the Act articulated in the lead opinion in *Georgia*. As noted above (at 24), that opinion spoke for no other member of the panel and thus does not constitute precedent of this Circuit. And it is inconsistent with the text of the Procurement Act and with the broad interpretation of the Act long embraced, as discussed above, by all three branches of the government.

The single-judge *Georgia* opinion construes the Procurement Act narrowly, as allowing the President only "to direct subordinate executive actors" in "carry[ing] out … specific provisions" set forth elsewhere in the relevant subtitle. 46 F.4th at 1295 (opinion of Grant, J.). It reaches that conclusion largely on the basis of the Act's historical purpose, *see id.* at 1293-1294, and a footnote in the Supreme Court's decision in *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979). But that reasoning is flawed for several reasons.

*First*, the statutory text refutes the proposition that a presidential directive is "consistent with this subtitle," 40 U.S.C. § 121(a), only if it effectuates a "specific provision[]" in the subtitle, *Georgia*, 46 F.4th at 1295 (opinion of Grant, J.). If the President's authority under § 121(a) were limited to issuing directives necessary to carry out specific statutory provisions, then it would have made no sense for Congress to specify that the President's directives must be "consistent with" the statute, because that would have been surplusage: A directive that carries out a statute's express terms is necessarily consistent with the statute. "Proper respect for Congress cautions courts against lightly assuming that any of the statutory terms it has chosen to employ are 'superfluous' or 'void' of significance." *Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024). The "consistent with" language implies that the President has authority to issue directives *not* limited to effectuating the statute's express terms, so long as they guide agencies in carrying out their contracting functions in a manner consistent with the articulated statutory objectives of economy and efficiency.

*Second*, courts can properly "consult extratextual sources," such as historical evidence of the purposes for which Congress enacted a statute, only

"to help 'clear up,'" and not to "'create[,]' ambiguity about a statute's original meaning." *McGirt v. Oklahoma*, 591 U.S. 894, 916 (2020). Congress may have enacted the Procurement Act because it was concerned, in the wake of World War II, about "'wasteful practices'" in procurement, *Georgia*, 46 F.4th at 1293 (opinion of Grant, J.). But it is "'the provisions of our laws rather than the principal concerns of our legislators by which we are governed.'" *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004). The authority specified by the Procurement Act's text extends well beyond the narrow scope that would have been sufficient to address Congress's concerns.

*Finally*, the *Chrysler* footnote sheds no meaningful light on the construction of the Procurement Act. The issue in *Chrysler* was whether regulations requiring the disclosure of certain information had "the 'force and effect of law,'" which turned on whether there was "a nexus between the regulations and some delegation of the requisite legislative authority by Congress." 441 U.S. at 304. The regulations were putatively authorized by an executive order requiring that government contractors "provide equal employment opportunity regardless of race or sex." *Id.* at 286; *see id.* at 303. The Supreme Court concluded that it was "not necessary to decide whether" the executive order was authorized by the Procurement Act, or by other statutes,

because the Court found it sufficiently clear that the *regulations* were not contemplated by any of the statutes. *Id.* at 304-306. In the footnote in question, the Court observed that "[l]ower courts ha[d] suggested" the Procurement Act "was the authority for predecessors of" the executive order, but it noted that "these suggestions were dicta" and that the Act contains no "specific reference to employment discrimination." *Id.* at 304 n.34. As the Fifth Circuit recognized in *Louisiana*, the footnote's "'specific reference'" language, which was itself "dicta," cannot be read as "a narrowing instruction for interpretation of" the Procurement Act. 55 F.4th at 1025-1026, 1026 n.24.[1]

---

[1] In a footnote (at 25 n.14), plaintiffs' brief also invokes the major questions doctrine as support for the conclusion that the Procurement Act does not authorize the challenged directive. That argument is waived by its undeveloped character and placement in a footnote, *see SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 811-812 (11th Cir. 2015), and it lacks merit. The major questions doctrine addresses the concern of "*agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (emphasis added). That concern dissipates where Congress delegates authority directly to the President—"the most democratic and politically accountable official in Government," *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020). *See, e.g.*, *Mayes*, 67 F.4th at 933; *Georgia*, 46 F.4th at 1313 (Anderson, J., concurring in part and dissenting in part). Moreover, Procurement Act directives are exercises of "proprietary authority," *Bradford*, 101 F.4th at 726; *Mayes*, 67 F.4th at 935—*i.e.*, the President's management of the Executive Branch—not of "regulatory authority," *Bradford*, 101 F.4th at 726; *Mayes*, 67

*Continued on next page.*

d.     In any event, even if the single-judge *Georgia* opinion were correct, the PLA directive would still pass muster because it directs agencies in their exercise of existing contracting authority under several specific provisions of the relevant subtitle.  One such provision, 41 U.S.C. § 3101(a), confers on "the civilian agencies of the government" broad "authority to negotiate contracts."  1B John Cosgrove McBride & Thomas J. Touhey, *Government Contracts: Law, Administration & Procedures* § 9.10, LexisNexis (database updated 2025).  Another provision, 41 U.S.C. § 3703(c), states that agencies shall award contracts "to the responsible source whose proposal is most advantageous to the Federal Government, considering" the "cost or price" of the contract "and the other factors included in the solicitation."  Under this provision, "agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'"  *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993).  And as discussed

_____

F.4th at 935, or some other power of "'the administrative state,'" *Biden v. Nebraska*, 600 U.S. 477, 505 (2023), binding members of the public.  Finally, the PLA directive is consistent with prior practice under the Procurement Act and has no vast economic or political significance.  *Cf. Bradford*, 101 F.4th at 727-728 (rejecting application of major questions doctrine to another Procurement Act directive); *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) (same), *pet. for reh'g pending* (No. 23-15179).

above, a third provision, 41 U.S.C. § 3306, allows agencies to "specify [their] needs," *id.* § 3306(a)(1)(A), and to "include restrictive provisions or conditions" in solicitations "to the extent necessary to satisfy [those] needs," *id.* § 3306(a)(2)(B). Agencies "enjoy[] broad discretion" under § 3306 "to determine [their] own needs," *FMS Inv. Corp. v. United States*, 144 Fed. Cl. 140, 144 (2019) (citing *Savantage*, 595 F.3d at 1286), and the challenged directive simply instructs them to presumptively consider PLAs to be among their needs in awarding large-scale construction contracts.

Thus, even if the single-judge opinion in *Georgia* were correct, and even if the challenged directive were not within the President's inherent power under Article II, plaintiffs would be unlikely to prevail on their claim that the President lacked authority to issue the directive.

## C. The Challenged Directive Is Consistent With The First Amendment

Plaintiffs are also unlikely to prevail on their claim that the PLA directive "infringes on [their] freedom of association by requiring [their] members to associate with unions" in order to receive covered contracts (Br. 28).

1. The governing precedent is *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47 (2006). In *FAIR*, an association of

law schools challenged the Solomon Amendment, which made it a condition of federal funding that law schools grant "military recruiters access equal to that provided other recruiters." *Id.* at 51.  The law schools "argued that this forced inclusion and equal treatment of military recruiters violated [their] First Amendment freedoms of speech and association" by "forc[ing] [them] to choose between exercising their First Amendment right to decide whether to disseminate or accommodate a military recruiter's message, and ensuring the availability of federal funding for their universities." *Id.* at 53.  The Supreme Court disagreed.

As to the freedom-of-speech claim, the Court explained that "[t]he Solomon Amendment neither limits what law schools may say nor requires them to say anything."  547 U.S. at 60.  The Amendment leaves schools free, the Court observed, "to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds." *Id.*  And it does not require them to speak in a particular way "because the schools are not speaking when they host interviews and recruiting receptions"; the reason "[l]aw schools facilitate recruiting" is not to disseminate a message but "to assist their students in obtaining jobs." *Id.* at 64.

The Court also rejected the law schools' freedom-of-expression claim. It explained that law schools "'associate' with military recruiters" only in "the sense that they interact with them." 547 U.S. at 69. And it described as "critical" the fact that recruiters "come onto campus for the limited purpose of trying to hire students—not to become members of the school's expressive association." *Id.*

2. *FAIR* is fatal to plaintiffs' free-speech and free-association claims here. As in *FAIR*, the PLA directive may require contractors (including plaintiffs' members) to do business with unions—to enter into agreements with them and abide by those agreements over the course of a construction project. But as in *FAIR*, that requirement "neither limits what [contractors] may say nor requires them to say anything," 547 U.S. at 60. Contractors remain free "to express whatever views they may have" about unions, "while retaining eligibility for federal" contracts, *id.*, and any requirement to do business with unions does not require contracts to engage in speech themselves, because the reason a contractor hires laborers (whether unionized or not) is not to disseminate a message but to achieve the functional purpose of completing their work, *cf. id.* at 64. Moreover, any requirement for contractors to engage with a union does not restrict their freedom of association

because, as in *FAIR*, contractors "'associate' with" unions only in "the sense that they interact with them." *Id.* at 69.

Several courts, applying *FAIR*, have rejected claims similar to plaintiffs'. In *Human Services Council of New York v. City of New York*, 2024 WL 4792004 (S.D.N.Y. Nov. 14, 2024), the district court rejected a First Amendment challenge to an ordinance requiring "human services contractors [to] enter into a contractual relationship with a labor organization" "as a condition of doing business with the City." *Id.* at *26. The court explained that the ordinance did "not require contractors to support unionization or espouse any other message" and that "an arm's length commercial relationship between a nonprofit organization and a labor union regarding the delivery of services under City contracts … bears none of the hallmarks of an intimate or expressive association protected by the First Amendment." *Id.* In *Christian Labor Association v. City of Duluth*, 2023 WL 3996240 (D. Minn. June 14, 2023), the district court rejected First Amendment challenges to PLAs by which several Minnesota cities "required contractors and subcontractors" to recognize a particular union as the "bargaining representative of their employees working on PLA projects" and to "hire their employees through the unions' job referral systems." *Id.* at *2. The court concluded

that, as in *FAIR*, "the referral provisions … do not limit or require speech" or "implicate First Amendment association rights." *Id.* at *10. And in *Arkansas Times LP v. Waldrip*, 37 F.4th 1386 (8th Cir. 2022), the en banc Eighth Circuit upheld an Arkansas law "requiring public contracts to include a certification that the contractor will not 'boycott' Israel," *id.* at 1390, explaining that the law did not prohibit contractors "from publicly criticizing Israel, or even protesting the statute itself," *id.* at 1394. Because the contractors' "commercial decisions are invisible to observers unless explained," the court held, "they are not inherently expressive and do not implicate the First Amendment." *Id.*

3.    Plaintiffs' contrary arguments (Br. 27-28) are meritless. Plaintiffs principally rely on *Road-Con, Inc. v. City of Philadelphia*, 120 F.4th 346 (3d Cir. 2024), a challenge to Philadelphia's requirement of PLAs for municipal contracts. There, the Third Circuit held that contractors had established standing to challenge the requirement because "'a plaintiff … suffers injury to his legally protected First Amendment interest … when the state forces him to speak … or associate.'" *Id.* at 355. In doing so, the court relied on its prior conclusion that contractors challenging other required PLAs could plead Article III injuries to their First Amendment rights by alleging that they were

"forced to 'recognize a union' as the exclusive representative of their employees, 'hire employees from a union's job-referral system[],' and financially 'contribute to' unions in order to work on PLA-covered public projects." *Associated Builders & Contractors W. Pa. v. Community Coll. of Allegheny Cnty.*, 81 F.4th 279, 289 (3d Cir. 2023), *quoted in Road-Con*, 120 F.4th at 355.

Crucially, however, the Third Circuit did not reach the merits of the First Amendment issues in either case. In *Associated Builders & Contractors*, the court held that the contractors had "plead[ed] themselves out of" standing by alleging that "they never have and never will bid on PLA-covered projects." 81 F.4th at 289. And in *Road-Con*, although the court held that the plaintiffs had established standing—and thus vacated the district court's ruling to the contrary—it declined to reach the merits, instead remanding for the district court to do so. 120 F.4th at 359-360. To the extent the language quoted above could be interpreted as expressing a view on the merits, it should be read in light of the rule that courts must "'assume for the purposes of'" determining standing "'that a plaintiff has stated valid legal claims,'" *Weichsel v. JP Morgan Chase Bank, N.A.*, 65 F.4th 105, 111 (3d Cir. 2023). The Third Circuit cases thus do not help plaintiffs on the merits.

Plaintiffs' other citations are also inapposite. The district-court decision in *Associated Builders & Contractors of Southeast Texas v. Rung*, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016), addressed a compelled "disclosure requirement," *id.* at *8, nothing like the directive challenged here. The district-court decision in *Martin v. Wrigley*, 540 F. Supp. 3d 1220, 1229 (N.D. Ga. 2021), relied on the Eighth Circuit panel decision in *Arkansas Times*, which was eventually superseded by the en banc decision noted above (which disagreed with the panel). And plaintiffs appear to cite this Court's unpublished decision in *White v. School Board of Hillsborough County*, 2009 WL 174944 (11th Cir. Jan. 27, 2009), for the inapposite proposition "that government contractors are protected under the First Amendment from retaliatory government action to the same extent as government employees," *id.* at *3.[2]

## D. Plaintiffs' Other Claims Are Meritless

Finally, plaintiffs are unlikely to prevail on any of the other claims cursorily discussed in a catchall section of their brief (at 31-32).

---

[2] In a footnote (Br. 28 n.17), plaintiffs also suggest that the challenged directive requires plaintiffs' members "to aid and abet the infringement of employee rights under the Constitution" by "compel[ling] their employees to associate with unions as a condition of award of construction work." That argument is wholly undeveloped—indeed, unsupported by any citation of authority—and thus waived. *See Big Apple Consulting*, 783 F.3d at 811-812.

1.     The challenged executive order is not subject to the reasoned-decisionmaking requirements of the APA because the President is not an agency within the meaning of the APA, *see Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Executive orders like this one can be judicially reviewed for whether they are statutorily or constitutionally authorized, *see supra* pp. 34-46, but not for whether they are reasonable and reasonably explained in the manner required of agency rules under the arbitrary-and-capricious standard, *see Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The same is true of agency actions implementing determinations that Congress has vested directly in the President, such as directives issued under the Procurement Act.  Agencies lack the power to disagree with the President's exercise of policy discretion vested specifically in him, so when agencies implement such directives by the President, there is no genuine agency decisionmaking to review.  *See, e.g., Bradford*, 101 F.4th at 731 ("[I]t would have been futile for DOL to have considered comments advocating alternatives that it lacked discretion to adopt."); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (declining to consider claim that the Secretary of Homeland Security was "required to explain a legal conclusion that was not

hers to make"); Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2351 (2001) (distinguishing a challenge "to an action delegated to an agency head but directed by the President," as to which "the review provisions usually applicable to that agency's action should govern," from "a challenge to an action that Congress has committed to the sole discretion of the President"). Applying APA standards to presidential determinations as implemented by an agency would also "contravene the thrust of the Supreme Court's holding in *Franklin* by subjecting almost every executive order to APA review." *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 (S.D. Tex. 2022), *aff'd*, 63 F.4th 366 (5th Cir. 2023) (en banc), *vacated as moot*, 144 S. Ct. 480 (2023).

In any event, the rule implementing the PLA directive would pass arbitrary-and-capricious review if it were applicable. Such review "'is exceedingly deferential,'" meant only "to ensure that the agency came to a rational conclusion." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). The agency plainly did so here; indeed, plaintiffs offer essentially no explanation for their contrary assertion (Br. 31).

For the same reasons, plaintiffs are incorrect to suggest that the challenged rule failed to comply with the agency decisionmaking requirements

set forth in the Small Business Act and Regulatory Flexibility Act. The implementing rule acknowledged concerns about small businesses and responded to them by stating that, because the challenged executive order creates a presumption in favor of requiring PLAs on large-scale construction projects absent an exception, "there are no alternatives available that would reduce the impact on or exempt small entities from its requirements." 88 Fed. Reg. at 88,725. That is sufficient given the agencies' inability to depart from the President's exercise of policymaking discretion vested in him. *See Bradford*, 101 F.4th at 731.

2. Plaintiffs briefly suggest (Br. 32) that the promulgation of OMB's 2023 guidance memorandum violated the notice-and-comment requirement of the Office of Federal Procurement Policy (OFPP) Act. It did not. The OFPP Act generally requires that "a procurement policy, regulation, procedure, or form" not take effect until 60 days after public comment if it "relates to the expenditure of appropriated funds" and "has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form" or "a significant cost or administrative impact on contractors or offerors." 41 U.S.C. § 1707(a)(1). Here, however, the OMB

guidance has no independent legal force; it simply guides agencies in complying with the challenged rule and executive order. It therefore "constitutes nonbinding guidance that does not rise to the level of a 'procurement policy, regulation, procedure, or form.'" *Kentucky v. Biden*, 571 F. Supp. 3d 715, 731 (E.D. Ky. 2021) (addressing guidance implementing a different Procurement Act directive), *aff'd as modified*, 57 F.4th 545 (6th Cir. 2023).

3. Finally, plaintiffs argue in one paragraph (Br. 32) that the PLA directive violates Section 8(d) of the National Labor Relations Act (NLRA). As the Supreme Court has explained, that provision prevents the National Labor Relations Board (NLRB) from "compel[ling] a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement." *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 102 (1970). Section 8(d) is wholly inapposite here. The PLA directive does not come from the NLRB and does not directly bind contractors or unions at all; rather, it guides government agencies as to what terms they should require in their own contracts. And it does not require PLAs to contain any particular substantive terms. It simply prescribes minimum standards that a PLA must include in order for the contractor to meet the government's needs, while leaving the

details of PLAs to private negotiation. *Cf. Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 754-755 (1985) (NLRA does not preempt imposition of minimum standards that may affect contract terms).

## CONCLUSION

The district court's order denying a preliminary injunction should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

GREGORY W. KEHOE
  *United States Attorney*

CHARLES W. SCARBOROUGH

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *daniel.l.winik@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,653 words. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

# ADDENDUM

# TABLE OF CONTENTS

40 U.S.C. § 101.................................................................................... A1

40 U.S.C. § 121.................................................................................... A1

41 U.S.C. § 107.................................................................................... A1

41 U.S.C. § 113.................................................................................... A2

41 U.S.C. § 3301.................................................................................. A2

**40 U.S.C. § 101**

**§ 101. Purpose**

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

**40 U.S.C. § 121**

**§ 121. Administrative**

(a) Policies prescribed by the President.—The President may prescribe policies and directives that the President considers necessary to carry out this subtitle.  The policies must be consistent with this subtitle.

…

**41 U.S.C. § 107**

**§ 107. Full and open competition**

In this subtitle, the term "full and open competition", when used with respect to a procurement, means that all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement.

## 41 U.S.C. § 113

### § 113. Responsible source

In this subtitle, the term "responsible source" means a prospective contractor that—

(1) has adequate financial resources to perform the contract or the ability to obtain those resources;

(2) is able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and Government business commitments;

(3) has a satisfactory performance record;

(4) has a satisfactory record of integrity and business ethics;

(5) has the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain the organization, experience, controls, and skills;

(6) has the necessary production, construction, and technical equipment and facilities, or the ability to obtain the equipment and facilities; and

(7) is otherwise qualified and eligible to receive an award under applicable laws and regulations.


## 41 U.S.C. § 3301

### § 3301. Full and open competition

(a) In general.—Except as provided in sections 3303, 3304(a), and 3305 of this title and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services shall—

(1) obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation; and

(2) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

(b) Appropriate competitive procedures. —

(1) Use of sealed bids. —In determining the competitive procedures appropriate under the circumstance, an executive agency shall—

(A) solicit sealed bids if—

(i) time permits the solicitation, submission, and evaluation of sealed bids;

(ii) the award will be made on the basis of price and other price-related factors;

(iii) it is not necessary to conduct discussions with the responding sources about their bids; and

(iv) there is a reasonable expectation of receiving more than one sealed bid; or

(B) request competitive proposals if sealed bids are not appropriate under subparagraph (A).

(2) Sealed bid not required.—Paragraph (1)(A) does not require the use of sealed-bid procedures in cases in which section 204(e) of title 23 applies.

(c) Efficient fulfillment of Government requirements.—The Federal Acquisition Regulation shall ensure that the requirement to obtain full and open competition is implemented in a manner that is consistent with the need to efficiently fulfill the Federal Government's requirements.