**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 25-11375
_____

ASSOCIATED BUILDERS AND CONTRACTORS FLORIDA
FIRST COAST CHAPTER,
ASSOCIATED BUILDERS AND CONTRACTORS,

*Plaintiffs-Appellants,*

*versus*

GENERAL SERVICES ADMINISTRATION,
   William F. Clark, Director, Office of Government-Wide
   Acquisition Policy,
OFFICE OF MANAGEMENT AND BUDGET,
   Christine J. Harada, Far Council Chair, Senior Advisor
   to the Deputy Director for Management,
UNITED STATES DEPARTMENT OF DEFENSE,
   John M. Tenaglia, Principal Director, Defense Pricing
   and Contracting,
NATIONAL AERONAUTICS AND SPACE
ADMINISTRATION,
   Karla S. Jackson, Assistant Administrator
   for Procurement,

GENERAL SERVICES ADMINISTRATION,

Jeffrey A. Koses, Senior Procurement Executive, et al.,

*Defendants-Appellees.*

––––––––––––––––––––––––

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:24-cv-00318-WWB-MCR

––––––––––––––––––––––––

Before WILLIAM PRYOR, Chief Judge, and BRANCH and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether two builders' associations are likely to succeed on statutory and constitutional challenges to a procurement mandate. In February 2022, President Joseph Biden signed an executive order presumptively requiring that federal construction contractors enter into project labor agreements with unions to improve the efficiency of their work. The Associated Builders and Contractors and its Florida First Coast Chapter brought a facial challenge to the order, accompanying regulations, and enforcement guidance published by the Office of Management and Budget. After the district court denied their motion for a preliminary injunction, the associations filed this interlocutory appeal. While the appeal was pending, Russell Vought, the new Director of the Office of Management and Budget, issued a memorandum stating that the executive order remains in effect during the Trump administration. Because the associations are not likely to succeed on the merits of their claims, we affirm.

## I. BACKGROUND

We describe the background of this appeal in two parts. We first recount President Biden's mandate of project labor agreements for federal construction projects. We then describe the associations' challenges to that mandate in the district court.

*A. President Biden Instructs Agencies to Require Project Labor Agreements for Large-Scale Federal Construction Projects.*

Project labor agreements are "multi-employer, multi-union pre-hire agreement[s] designed to systemize labor relations at a construction site." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002). They ordinarily require that "all contractors and subcontractors who will work on a project subscribe to the agreement," that "all contractors and subcontractors agree in advance to abide by a master collective bargaining agreement for all work on the project," and that "wages, hours, and other terms of employment be coordinated or standardized pursuant to the [agreement] across the many different unions and companies working on the project." *Id.*

Presidential support for project labor agreements has varied. President George H.W. Bush prohibited agencies from requiring them. Exec. Order No. 12,818, 57 Fed. Reg. 48713, 48713 (Oct. 23, 1992). President William Clinton revoked that order and allowed them. Exec. Order 12,836, 58 Fed. Reg. 7045, 7045 (Feb. 1, 1993). President George W. Bush barred agencies from either requiring or prohibiting them. Exec. Order 13,202, 66 Fed. Reg. 11225, 11225 (Feb. 17, 2001). And President Barack Obama "encourage[d]

executive agencies to consider requiring" them. Exec. Order No. 13,502, 74 Fed. Reg. 6985, 6985 (Feb. 6, 2009). His order remained in effect during the first administration of President Donald Trump.

President Biden addressed the subject in an executive order in February 2022. He found that "[l]arge-scale construction projects pose special challenges to efficient and timely procurement by the Federal Government." Exec. Order No. 14,063, 87 Fed. Reg. 7363, 7363 (Feb. 4, 2022). He also determined that project labor agreements "are often effective in preventing these problems from developing." *Id.* So, "[b]y the authority vested in [him under] . . . the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act," President Biden established a presumptive requirement that "every contractor or subcontractor engaged in construction" on federal construction projects valued at "$35 million or more" must "negotiate or become a party to a project labor agreement with one or more appropriate labor organizations." *Id.* at 7363–64.

Senior officials within procurement agencies "may grant an exception . . . for a particular contract by . . . providing a specific written explanation of why at least one of [three] circumstances exists with respect to that contract." *Id.* at 7364. First, an official may explain that a project labor agreement would "not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement." *Id.* Second, an official may conclude "[b]ased on an inclusive market analysis" that requiring an

agreement would "substantially reduce the number of potential bidders so as to frustrate full and open competition." *Id.* Third, an official may specify that mandating an agreement would "be inconsistent with statutes, regulations, Executive Orders, or Presidential Memoranda." *Id.*

President Biden instructed the Federal Acquisition Regulatory Council to "propose regulations implementing the provisions of [his] order." *Id.* at 7365. The Council "assist[s] in the direction and coordination of Government-wide procurement policy" and comprises officials from the Office of Federal Procurement Policy, the Department of Defense, the National Aeronautics and Space Administration, and the General Services Administration. 41 U.S.C. §§ 1102, 1302(a), (b)(1). As directed, after a notice and comment period, the Council issued its implementing regulations in December 2023. *See* Use of Project Labor Agreements for Federal Construction Projects, 88 Fed. Reg. 88708 (Dec. 22, 2023). The regulations "require use of project labor agreements for contractors and subcontractors engaged in construction" on "large-scale construction project[s]." FAR 22.503(b). And they include the same three exceptions allowed by the executive order. *Id.* at 22.504(d)(1)(i)–(iii).

President Biden instructed the Office of Management and Budget to "issue guidance" for the three exceptions. 87 Fed. Reg. at 7365. The Office published a guidance memorandum shortly before the regulations took effect. The guidance memorandum reiterated that exceptions are available where requiring a project labor

agreement "would . . . be inconsistent with federal statutes." And it outlined "[a]dditional management considerations" to assist agencies as they determined whether exceptions should be granted because project labor agreements "would not promote economy and efficiency" or "would inhibit competition."

   *B. The Associations Sue to Enjoin the Procurement Mandate.*

   Members of the Associated Builders and Contractors and its Florida First Coast Chapter "share the belief that work in the construction industry should be awarded and performed on the basis of merit" alone. Most of the associations' members opt not to affiliate with unions. Because the new procurement mandate conditions federal construction contracts on entry into project labor agreements with unions, the associations contend that their members "are being unfairly deprived of significant contracting opportunities."

   The associations sued officials in multiple procurement agencies. They alleged that the executive order, regulations, and guidance memorandum are facially defective under the Competition in Contracting Act of 1984, Pub. L. No. 98-369, 98 Stat. 1175 (codified as amended in scattered sections of 41 U.S.C.); the Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, 63 Stat. 377 (codified as amended in scattered sections of 40 U.S.C.); the First Amendment, U.S. CONST. amend. I; the Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified as amended in scattered sections of 5 U.S.C.); the Office of Federal Procurement Policy Act, Pub. L. No. 93-400, 88 Stat. 796

(1974) (codified as amended in scattered sections of 41 U.S.C.); and the National Labor Relations Act, Pub. L. No. 74-198, 49 Stat. 449 (1935) (codified as amended in scattered sections of 29 U.S.C.). The associations sought a declaratory judgment that the procurement mandate is invalid, an order vacating the mandate, and a permanent injunction preventing the government from enforcing it against them.

One month after filing their complaint, the associations moved for a preliminary injunction. They attached affidavits explaining the success their members had enjoyed in securing federal construction contracts before President Biden signed the executive order. They asserted that the government had rendered the three exceptions in the executive order a "dead letter" by refusing to apply the exceptions when appropriate. And they identified specific construction projects on which their members would have bid if project labor agreements were not required.

The district court denied the motion for a preliminary injunction. It ruled that the associations had not satisfied their "heavy burden" to prove that the executive order likely exceeded the President's authority under the Federal Property Act. It ruled that the associations were likely to succeed on their facial challenge under the Competition Act because the government's "course of dealing" in "consistently declin[ing] to utilize the [three] exceptions" unduly restricted competition. But it found that the members of the associations would not suffer irreparable harm from any violations of the Competition Act because they could protest individual

procurements in the United States Court of Federal Claims. *See* 28 U.S.C. § 1491(b)(1). After it found that no "irreparable harm exists," the district court denied a preliminary injunction without addressing the associations' likelihood of success under the First Amendment, the Administrative Procedure Act, the Office of Federal Procurement Policy Act, and the National Labor Relations Act.

The associations filed this interlocutory appeal. *See id.* § 1292(a)(1). While the appeal was pending, the new Director of the Office of Management and Budget circulated a memorandum explaining that the executive order and its three exceptions "remain[] in effect" during the Trump administration. Memorandum from Russell T. Vought, Director, to Heads of Exec. Dep'ts & Agencies 1–2 (June 12, 2025), https://perma.cc/87ZL-SXD4. We take judicial notice of these instructions because they "are a matter of public record and are relevant to the appeal." *In re Nica Holdings, Inc.*, 810 F.3d 781, 785 n.3 (11th Cir. 2015) (citation and internal quotation marks omitted); FED. R. EVID. 201(b)(2).

After oral argument, we requested supplemental briefing to determine whether the associations should have filed their action in the Court of Federal Claims. The government and the associations both responded that the district court, not the Court of Federal Claims, had jurisdiction. We agree with the parties and proceed to the merits of the associations' appeal.

## II. STANDARDS OF REVIEW

We review the denial of a preliminary injunction for abuse of discretion. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th

1259, 1263 (11th Cir. 2023). "We review legal conclusions *de novo* and factual findings for clear error." *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir.), *cert. denied*, 144 S. Ct. 2601 (2024).

## III. DISCUSSION

"[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to . . . four prerequisites." *Siegel v. Le-Pore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (citation and internal quotation marks omitted). The movant must prove that it has "a substantial likelihood of success on the merits of the underlying case," that it "will suffer irreparable harm in the absence of an injunction," that "the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction is issued," and that "an injunction would not disserve the public interest." *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1273–74 (11th Cir. 2013) (citation and internal quotation marks omitted). Failure to establish any of the four prerequisites is fatal. *Siegel*, 234 F.3d at 1176.

The district court correctly denied a preliminary injunction but did so for the wrong reasons. We first explain that the district court erred in ruling that the associations would not suffer irreparable harm. We then explain that the associations nonetheless failed to establish a likelihood of success on the merits.

*A. The District Court Erred in Evaluating Irreparable Harm.*

The district court denied a preliminary injunction after finding that the associations' members would not be irreparably

harmed by violations of the Competition Act. It did not consider whether the associations were entitled to relief based on many of the other violations that they alleged. The district court erred.

The district court should have considered the possibility of irreparable harm "with respect to each claim" before finding that the associations failed to establish the required harm. *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008). Denying a preliminary injunction in multi-claim cases based on the absence of harm for a single claim risks error because different claims can present different harms. First Amendment claimants, for example, do not need to make a specific showing of irreparable harm because an ongoing deprivation of First Amendment rights "constitutes a per se irreparable injury." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). The associations alleged First Amendment violations in this case, yet the district court never considered the possibility of harm under the First Amendment because it focused exclusively on harm caused by the purported violations of the Competition Act. When a movant seeks a preliminary injunction based on multiple claims, a court should not deny the motion without finding that "each claim" fails to satisfy the requirements for injunctive relief. *N. Am. Med. Corp.*, 522 F.3d at 1226–29 (vacating preliminary injunction after separately analyzing irreparable harm as to both claims on which plaintiff was likely to succeed on the merits).

The district court also erred in its evaluation of irreparable harm under the Competition Act. The district court discounted the

"lost contract opportunities" and "systemic barriers to competition" alleged by the associations because it thought that their members "ha[d] adequate relief through individual bid protests before the Court of Federal Claims." But a court must assess irreparable harm by examining the adequacy of alternative "legal" remedies providing "monetary" relief. *Odebrecht Constr.*, 715 F.3d at 1288–89 (citation and internal quotation marks omitted); *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010). Congress has expressly limited "monetary relief" in bid-protest actions to "bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). It is only the equitable alternatives available in those actions—including "injunctive relief"—that could protect the associations' members against their alleged harms. *Id.*

The government responds that preliminary injunctions should not be granted where "other forms of corrective relief" are available. To be sure, we have stated that "[t]he possibility [of] adequate compensatory or other corrective relief . . . in the ordinary course of litigation . . . weighs heavily against a claim of irreparable harm." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation and internal quotation marks omitted). But equitable remedies available in another court do not provide the kind of "corrective relief" that forecloses a preliminary injunction. *Id.* Our test for injunctive relief asks "whether the plaintiffs [are] likely to suffer irreparable injury *absent an injunction*," *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020), not whether an injunction could be obtained elsewhere.

*B. The Associations Are Unlikely to Succeed on the Merits.*

Although the district court's erroneous understanding of irreparable harm led it to deny a preliminary injunction for the wrong reason, "we may affirm on any ground supported by the record, regardless of whether that ground was relied upon or even considered below." *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1335 (11th Cir. 2019) (alteration adopted) (citation and internal quotation marks omitted). The government and the associations both urge us to decide whether the associations' facial challenge is likely to succeed on the merits. We accept the parties' invitation and conclude that the associations' facial challenge is unlikely to succeed.

We divide our discussion in four parts. We first explain that the associations are unlikely to succeed under the Competition Act. We next explain that they are unlikely to succeed under the Federal Property Act. We then explain that they are unlikely to succeed under the First Amendment. And we finally explain that they are unlikely to succeed under the Administrative Procedure Act, the Office of Federal Procurement Policy Act, and the National Labor Relations Act.

In evaluating the associations' likelihood of success, we heed the Supreme Court's admonition that "facial challenges [are] hard to win." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). The procurement mandate is facially defective under the statutes invoked by the associations only if "no set of circumstances exists under which the [mandate] would be valid." *SisterSong Women of*

*Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1328 (11th Cir. 2022) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). And the mandate is facially defective under the First Amendment "only if [its] unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 144 S. Ct. at 2397.

### 1. The Associations Are Unlikely to Succeed under the Competition Act.

The Competition Act requires a system of "full and open competition" in federal contracting. 41 U.S.C. § 3301(a)(1). "Full and open competition," when used to describe a "procurement," means that "all responsible sources are permitted to submit sealed bids or competitive proposals on the procurement." *Id.* § 107. A "procurement" includes "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." *Id.* § 111. "Responsible sources" are prospective contractors qualified to perform a job based on multiple factors, including "financial resources," "performance record," "technical skills," ability "to comply with the required or proposed delivery or performance schedule," and eligibility "to receive an award under applicable laws and regulations." *Id.* § 113. Agencies violate the Competition Act when qualified and eligible contractors do not receive a fair opportunity to submit bids on a given project.

The associations contend that the procurement mandate is facially invalid under the Competition Act because mandatory project labor agreements undermine full and open competition on

large-scale construction projects. We disagree. Each component of the mandate is facially consistent with the Competition Act.

The executive order expressly permits senior agency officials to grant exceptions from the presumptive requirement to join a project labor agreement when an exception is necessary to preserve "full and open competition" or otherwise comply with "statutes" and "regulations." 87 Fed. Reg. at 7364. The order also permits exceptions where a project labor agreement "would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement," *id.*, a provision that accounts for a requirement in the Competition Act that agencies "include restrictive provisions or conditions" in contract solicitations "only to the extent necessary to satisfy the[ir] needs." 41 U.S.C. § 3306(a)(2)(B). Assuming agencies take these exceptions seriously, it is impossible for the order to conflict with the Competition Act because the exceptions incorporate the Act by reference. The same is true of the regulations promulgated to enforce the order, FAR 22.504(d)(1)(i)–(iii), and of the memoranda issued by the Office of Management and Budget. In the light of the exceptions, there is at least one "set of circumstances" under which the mandate complies with the Competition Act: when the exceptions are faithfully applied. *Sister-Song*, 40 F.4th at 1328 (citation and internal quotation marks omitted).

The district court ruled that the associations were likely to succeed under the Competition Act because the government had "rendered the exceptions . . . functionally meaningless" by

"consistently declin[ing] to utilize" them. This focus on the "course of dealing" erroneously evaluates the associations' competition claim through an *as-applied* lens. As the associations clarified at oral argument and repeatedly acknowledged in supplemental briefing, their action "is a facial challenge" and does not turn on conduct in connection with "any individual procurements." Whether and to what extent the government applies the exceptions in practice does not tell us whether the procurement mandate is defective on its face. Because the exceptions on their face create a possibility that procurements will not "be inconsistent with statutes," 87 Fed. Reg. at 7364, "[t]his mere possibility . . . is enough to defeat a facial challenge" under the Competition Act. *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1313 (11th Cir. 2009).

### 2. The Associations Are Unlikely to Succeed under the Federal Property Act.

The associations next argue that President Biden lacked authority to issue the executive order. The order invokes the President's authority under "the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act." 87 Fed. Reg. at 7363. The Federal Property Act aims "to provide the Federal Government with an economical and efficient system" for public contracting. 40 U.S.C. § 101. As part of that system, "[t]he President may prescribe policies and directives that the President considers necessary to carry out this subtitle," but only if "[t]he policies [are] consistent with this subtitle." *Id.*

§ 121(a). The referenced "subtitle" is defined to include specific sections in titles 40 and 41. *Id.* § 111.

Four years ago, we confronted a statutory challenge under the Federal Property Act to an executive order providing that employees working on federal contracts must be fully vaccinated against COVID-19. *Georgia v. President of the United States*, 46 F.4th 1283, 1289 (11th Cir. 2022). Judge Grant concluded that "the President likely exceeded his authority under the . . . Act when directing executive agencies to enforce [the vaccination] mandate." *Id.* at 1297. Judge Edmonson separately "concur[red] in the result" but did not join Judge Grant's opinion. *Id.* at 1308. He stated without elaboration that "the briefs, precedents, and other authorities" led him to "believe that plaintiffs ha[d] a reasonable chance to succeed" in proving that the mandate was unlawful. *Id.* Judge Anderson dissented. *Id.*

The parties disagree about how to apply our colleagues' opinions. The associations describe Judge Grant's opinion as controlling, and the government contends that Judge Grant wrote only for herself. "When faced with a fragmented Court, we may distill the various opinions down to their narrowest grounds of concurrence to derive any binding precedent." *Redner v. Dean*, 29 F.3d 1495, 1499 (11th Cir. 1994) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). Although we ordinarily apply that principle to decisions of the Supreme Court, there is no reason to apply a different principle to our own decisions. Judge Edmonson provided the narrowest grounds of concurrence in *Georgia* when he opined that the *Georgia*

"plaintiffs ha[d] a reasonable chance to succeed on the merits." 46 F.4th at 1308. His reasoning was limited to the vaccine issue before him and did not adopt a definitive interpretation of the Federal Property Act. So we interpret the text of the Act using traditional tools of statutory interpretation and consider our colleagues' opinions only for their persuasiveness.

Two criteria constrain presidential directives under the Federal Property Act. First, the President must conclude that a directive is "necessary to carry out this subtitle." 40 U.S.C. § 121(a). Second, the directive must be "consistent with this subtitle." *Id.* President Biden's order regarding project labor agreements satisfies both criteria.

Executive orders carry out the subtitle when they "put [it] into execution." *Carry Out*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). Part of the defined subtitle that the President can put into execution is section 3306 of title 41. *See* 40 U.S.C. § 111. Section 3306 instructs executive agencies to "specify [their] needs" when preparing for a procurement and permits them to "include restrictive provisions or conditions" in solicitations when "necessary to satisfy" their needs. 41 U.S.C. § 3306(a)(1)(A), (2)(B). In other words, the President can carry out the subtitle by telling agencies which "restrictive provisions or conditions" to include in solicitations. *Id.* § 3306(a)(2)(B).

The statutory text grants the President substantial discretion in specifying those conditions as he "considers necessary." 40 U.S.C. § 121(a). "Necessary," when used to refer to the government's

authority, "frequently imports no more than that one thing is convenient, or useful, or essential to another." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819); *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018). And the Property Act requires a flexible understanding of necessity because it gives the President the authority to take actions that *he* considers necessary. This "sweeping, discretion-conferring language," *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 645 (2026) (describing provision permitting the President to "'take such action as he deems necessary' to adjust the imports of a good" (alteration adopted) (emphasis omitted) (quoting 19 U.S.C. § 1862(b) (1970))), "exudes deference to the President," *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) (interpreting provision permitting the President to suspend immigration "for such period as he shall deem necessary" and to impose "any restrictions he may deem to be appropriate" (quoting 8 U.S.C. § 1182(f))).

The executive order articulates a condition that the President "consider[ed] necessary" to carry out the subtitle with respect to certain construction procurements. 40 U.S.C. § 121(a). As the order explains, "[l]arge-scale construction projects pose special challenges to efficient and timely procurement by the Federal Government." 87 Fed. Reg. at 7363. President Biden, and now President Trump, determined that a presumption favoring project labor agreements helps to alleviate these challenges by "provid[ing] structure and stability" for such projects, "avoid[ing] labor-related disruptions" on the job, "secur[ing] the commitment of all stakeholders on a construction site," and otherwise "reducing uncertainties." *Id.*; *see also Bldg. & Constr. Trades Council of Metro. Dist. v.*

*Associated Builders & Contractors of Mass./R.I., Inc. (Bos. Harbor)*, 507 U.S. 218, 231 (1993) (noting that project labor agreements can help "accommodate conditions specific to [the construction] industry," including "the contractor's need for predictable costs and a steady supply of skilled labor"). And, when requiring a project labor agreement would not promote "economy and efficiency," the order permits agencies to apply an exception. 87 Fed. Reg. at 7364.

The executive order is "consistent with" the defined subtitle. 40 U.S.C. § 121(a). The only potential inconsistency highlighted by the associations is the purported conflict between the order and provisions in title 41 incorporating the "full and open competition" requirement of the Competition Act. *See* 41 U.S.C. § 3301. We have already concluded that the associations are unlikely to prevail on their facial challenge under the Competition Act. And courts that have sustained challenges to presidential directives under the Federal Property Act have acknowledged that there are no problems where an executive order "has a close nexus to the ordinary hiring, firing, and management of labor." *E.g.*, *Kentucky v. Biden*, 23 F.4th 585, 607–08 (6th Cir. 2022) (citation and internal quotation marks omitted). The executive order we address here clearly has such a nexus.

The associations' counterarguments fail. They argue that the Federal Property Act lacks a "specific reference" to project labor agreements. But the Act does not require the President to stay on the sidelines if Congress has not expressly approved a particular condition in advance. It permits the President to "prescribe policies

and directives" that *he* "considers necessary to carry out th[e] subtitle." 40 U.S.C. § 121(a). And the subtitle specifically references executive authority to "include restrictive provisions or conditions" in solicitations so that agencies can "satisfy the[ir] needs." 41 U.S.C. § 3306(a)(2)(B); *see also id.* § 3703(c) (instructing agencies to select contractors whose proposals are "most advantageous to the Federal Government"). The associations' insistence on *even greater* specificity from Congress undermines the broad deference to the President commanded by the statutory text. *See Learning Res.*, 146 S. Ct. at 645; *Hawaii*, 138 S. Ct. at 2408. "[B]road grant[s] of authority . . . do[] not require an indication that specific activities are permitted." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1288 (11th Cir. 2021).

The associations unpersuasively contend that the President needed "clear congressional authorization" to mandate project labor agreements under the major questions doctrine. The Supreme Court applies this doctrine to "[e]xtraordinary grants of *regulatory* authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (emphasis added). But the President, as authorized by Congress, has invoked his *proprietary* authority to instruct agencies about "the purchasing of the Government's goods and [services]." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 130 (1940). "Time and again" the Supreme Court "ha[s] recognized that the Government has a much freer hand in dealing with" its own employees and contractors "than it does when it brings its sovereign power to bear on citizens at large." *NASA v. Nelson*, 562 U.S. 134, 148 (2011) (citation and internal quotation marks omitted).

Even if we assume that the major questions doctrine can apply to the President's proprietary actions, the procurement mandate remains far removed from the examples highlighted by the Supreme Court of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 142 S. Ct. at 2609. This case involves labor restrictions specific to a subset of construction contracts designed to promote "an economical and efficient system for federal contracting." *Georgia*, 46 F.4th at 1296 (citation and internal quotation marks omitted). And those restrictions stem from a statute that multiple presidents have invoked to advance their policy preferences regarding project labor agreements. *See, e.g.*, 57 Fed. Reg. at 48713; 74 Fed. Reg. at 6985. The procurement mandate does not implicate the major questions doctrine or facially violate the Federal Property Act.

### 3. The Associations Are Unlikely to Succeed under the First Amendment.

The associations next argue that mandating participation in project labor agreements "infringes on [their] freedom of association" under the First Amendment by "requiring [their] members to associate with unions to bid on and/or perform contracts." But the associations fail to grapple with the "rigorous standard" that governs facial challenges under the First Amendment. *Moody*, 144 S. Ct. at 2397. To prevail on such a challenge, the associations must establish that any "unconstitutional applications" of the mandate "substantially outweigh its constitutional ones" across all covered

"activities" and "actors." *Id.* at 2397–98. The associations have not established that they are likely to satisfy this burden because they have not identified any applications of the mandate that are unconstitutional. *Cf. id.* at 2394 (vacating reversal of preliminary injunction and remanding for facial balancing analysis where movant demonstrated that at least one "specific application" of the challenged law was "unlikely to withstand First Amendment scrutiny"); *In re Ga. Senate Bill 202*, 160 F.4th 1171, 1176–77 (11th Cir. 2025) (vacating grant of preliminary injunction and remanding for facial balancing analysis where district court identified a First Amendment violation without considering other applications).

The associations erroneously assume that any form of compelled interaction with a union is unconstitutional. For a group to invoke the freedom of association, it must "engage in some form of expression," and "[t]he forced inclusion of an unwanted person" must "affect[] in a significant way the group's ability" to engage in that expression. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The associations never state, much less argue, that their members are engaged in any expressive activities.

Nor would a contractual relationship with a union while completing a construction project hinder whatever expressive activities the associations' members might conduct. Instead, the members would "associate" with unions under a project labor agreement only "in the sense that they interact with them." *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 60, 69 (2006) (holding that law schools did not suffer deprivation of First

Amendment associational rights where federal statute conditioned funding on permitting military recruiters to recruit on campus). Although the associations attempt to distinguish *Rumsfeld* because a project labor agreement "requir[es] mutual agreement to various terms of employment" and is "more intrusive" than the statute upheld in *Rumsfeld*, the associations still do not explain how the terms to which they might agree would restrict their expression. Absent a "significant" impediment to "some form of expression," we cannot conclude that the mandate to enter into project labor agreements violates the freedom of association. *Dale*, 530 U.S. at 648.

Even if the mandate affected associational rights, the government "has interests as an employer . . . that differ significantly from those it possesses in connection with regulation . . . of the citizenry in general." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2477 (2018) (citation and internal quotation marks omitted). This distinction, which extends to the government's proprietary interests in managing federal contractors, *see Nelson*, 562 U.S. at 138–39, 148–49, 151–54, means the government may "require that a union serve as exclusive bargaining agent" on its projects without violating the First Amendment, *Janus*, 138 S. Ct. at 2478. It also means the government may select construction contractors "based upon [their] willingness to enter into a [project labor] agreement," *Bos. Harbor*, 507 U.S. at 230–31, just as private construction employers may "condition . . . employment" on "membership in [a] labor organization" under the National Labor Relations Act, 29 U.S.C. § 158(f). The procurement mandate is consistent with these authorities.

The associations assert, in a footnote, that the mandate also "requires [their] members . . . to aid and abet the infringement of employee rights under the Constitution." The government correctly responds that the associations forfeited this argument by making it in a single sentence unsupported by any reasoning or citations to authority. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). The National Right to Work Legal Defense Foundation attempts to save the argument in an amicus brief, but amici curiae ordinarily "may not expand the scope of an appeal to implicate issues not [preserved] by the parties." *Glob. Marine Expl., Inc. v. Republic of France*, 151 F.4th 1296, 1310 (11th Cir. 2025) (citation and internal quotation marks omitted), *cert. denied*, No. 25-900 (U.S. Mar. 23, 2026). The same principle forecloses the amicus's argument that mandating project labor agreements "compels . . . contractors to speak with unions those contractors would otherwise not want to speak with and . . . restricts contractors' ability to freely speak with their employees." As the associations acknowledge in their reply brief, their challenge focuses on "free association" and not "free speech."

### 4. The Associations Are Unlikely to Succeed under the Other Statutes They Invoke.

The associations contend that the government violated the Administrative Procedure Act by "fail[ing] to provide an adequate explanation" for the mandate, "fail[ing] to meaningfully consider the many problems associated" with project labor agreements, overlooking "the negative impact . . . on small businesses," and

ignoring "overwhelming evidence that government-mandated [agreements] discourage competition and increase costs." The Administrative Procedure Act instructs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary-and-capricious standard is "exceedingly deferential," requiring only that "the agency c[o]me to a rational conclusion." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted). We may not "conduct [our] own investigation and substitute [our] own judgment for the administrative agency's decision." *Id.* (citation and internal quotation marks omitted).

The associations fail to establish that the government violated the Administrative Procedure Act. To start, the executive order is "not reviewable for abuse of discretion" under the Administrative Procedure Act because "the President is not an agency" subject to its requirements. *Franklin v. Massachusetts*, 505 U.S. 788, 796, 800–01 (1992). The standard of review for the executive order comes instead from the Federal Property Act. 40 U.S.C. § 121(a). And the order complied with the Federal Property Act for the reasons explained above.

The regulations promulgated by the Federal Acquisition Regulatory Council also withstand scrutiny. Although the associations fault the Council for ignoring problems with mandatory project labor agreements and dismissing comments with "minimal

analysis," the Council was acting in accordance with the President's directive to "implement[] the provisions of th[e] [executive] order." 87 Fed. Reg. at 7365. Absent a defect in the order itself, it would have been "arbitrary" and "capricious" and contrary to "law" for the Council *not* to implement the order. 5 U.S.C. § 706(2)(A). Executive agencies are not at liberty to disregard lawful directives from the President in whom "[t]he executive Power [is] vested." U.S. CONST. art. II, § 1; *see also Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024) (holding agency did not violate the Administrative Procedure Act in implementing executive order "because the agency had *no discretion* to act otherwise"), *cert. denied*, 145 S. Ct. 1047 (2025). And in the areas where the executive order left room for discretion, the Council "reviewed the public comments in the development of the final rule" and made appropriate changes accordingly. *See* 88 Fed. Reg. at 88709–26.

The associations assert that the Office of Management and Budget violated the Office of Federal Procurement Policy Act by promulgating guidance "without notice and opportunity for public comment." The government accurately describes this argument—raised in a single sentence in the opening brief lacking any textual analysis or citations to circuit precedent—as "cursor[y]." This limited briefing precludes the associations from "clearly establish[ing] the[ir] burden of persuasion" to support a preliminary injunction. *Siegel*, 234 F.3d at 1176 (citation and internal quotation marks omitted).

Finally, the associations and their supporting amicus cite to section 8(d) of the National Labor Relations Act, which prohibits the National Labor Relations Board from "compel[ling] either party to agree to a proposal" or "mak[e] . . . a concession" during collective bargaining. 29 U.S.C. § 158(d). But the National Labor Relations Board is not compelling anyone to do anything; indeed, the associations fail to explain how the Board is involved at all. The lone precedent on which the associations rely involved efforts by the Board to resolve a dispute between a union and an employer after the union asked the employer to deduct union dues from its employees' paychecks. *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 100–02 (1970). The Supreme Court held that the Board violated section 8(d) when, instead of "referee[ing] the process of collective bargaining," it required the employer to "grant to the Union a contract clause providing for the checkoff of union dues." *Id.* at 102, 107–08 (alteration adopted) (citation and internal quotation marks omitted). Here, in contrast, the government is specifying what terms it will include in its own contracts, not resolving labor disputes as a neutral arbiter.

It is well settled that the government can insist on its desired terms when acting "as proprietor" instead of "as regulator," *Bos. Harbor*, 507 U.S. at 227, and that it can "participate freely in the marketplace" without violating the National Labor Relations Act, *id.* at 230. This flexibility is particularly evident "in the construction industry," because the Act "explicitly permits [private construction] employers . . . to enter into prehire agreements . . . providing for union recognition." *Id.* (citing 29 U.S.C. § 158(f)). "To the extent

that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity *as purchaser* should be permitted to do the same." *Id.* at 231. Although the associations and the amicus observe that the *Boston Harbor* Court "decline[d] the invitation to address the application . . . of [section] 8(d)," *id.* at 232 n.2, nothing in that section prohibits the government from specifying its needs as a proprietor. The associations are unlikely to succeed on the merits.

## IV. CONCLUSION

We **AFFIRM** the denial of a preliminary injunction.

25-11375                    ABUDU, J., Concurring                    1

ABUDU, Circuit Judge, Concurring in Part, and Concurring in the Judgment:

I concur in part and concur in the judgment.[1]  I write separately to express disagreement with the opinion's reliance on *Learning Resources, Inc. v. Trump*, 146 S.Ct. 628, 645 (2026) and *Trump v. Hawaii*, 585 U.S. 667, 684 (2018), for the proposition that 40 U.S.C. § 121(a) contains similar "sweeping, discretion-conferring language" as was at issue in those cases such that courts should exercise "broad deference" to the President's actions under this statute.

---

[1] For clarity, I concur in the majority opinion except for the portions that read:

> And the Property Act requires a flexible understanding of necessity because it gives the President the authority to take actions that *he* considers necessary. This "sweeping, discretion-conferring language," *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 645 (2026) (describing provision permitting the President to "'take such action as he deems necessary' to adjust the imports of a good" (alteration adopted) (emphasis omitted) (quoting 19 U.S.C. § 1862(b) (1970))), "exudes deference to the President," *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) (interpreting provision permitting the President to suspend immigration "for such period as he shall deem necessary" and to impose "any restrictions he may deem to be appropriate" (quoting 8 U.S.C. § 1182(f))).

And:

> The associations' insistence on *even greater* specificity from Congress undermines the broad deference to the President commanded by the statutory text. *See Learning Res.*, 146 S. Ct. at 645; *Hawaii*, 138 S. Ct. at 2408.

2                    ABUDU, J., Concurring                    25-11375

*Learning Resources* and *Hawaii* dealt with the President's authority under two different statutes—50 U.S.C. § 1702(a)(1)(B) and 8 U.S.C. § 1182(f), respectively.  To the extent that these statutes contain similar language supporting the idea that courts must defer to the President's finding that an executive order or policy is necessary or appropriate, the Supreme Court's opinions provided distinct reasons for that deference in the context of the President's authority.[2]  The statute at issue in this case, 40 U.S.C. § 121(a), unlike either of those other two provisions, deals exclusively with the President's authority as a proprietor.  *Learning Resources* and *Hawaii* concern the President's authority over issues of national security and immigration, which are fundamentally distinct spheres of presidential power.  Indeed, as the Supreme Court noted in *Hawaii*, "in the context of international affairs and national security" the President is not required to "conclusively link all of the pieces in the puzzle" before courts grant weight to his empirical conclusions.

---

[2] Furthermore, the Supreme Court in *Hawaii* acknowledged another limit on presidential authority.  The Court recognized that the President's acts are circumscribed by constitutional prohibitions on animus, such as racial or religious discrimination, where the justification for the policy or action in question is "'inexplicable by anything but animus.'"  *Hawaii*, 585 U.S. at 706 (quoting *Romer v. Evans*, 517 U.S. 620, 635 (1996)); *see also id.* at 738 (Sotomayor, J., dissenting) ("[T]he dispositive and narrow question here is whether a reasonable observer, presented with all 'openly available data,' the text and 'historical context' of the Proclamation, and the 'specific sequence of events' leading to it, would conclude that the primary purpose of the Proclamation is to disfavor Islam and its adherents by excluding them from the country." (quoting *McCreary Cnty. v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 862–63 (2005))).

25-11375                ABUDU, J., Concurring                3

*Hawaii*, 585 U.S. at 686 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010)).  This is, in part, because "national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess." *Holder*, 561 U.S. at 34.

A court must look to the context in which presidential authority is exercised when determining the scope of deference the President enjoys.  *See Nat'l Aeronautics & Space Admin v. Nelson*, 562 U.S. 134, 148 (2011) ("[J]udicial review of the Government's challenged inquiries must take into account the context in which they arise.").  Even if the level of deference afforded to the President in issues concerning national security and immigration is analogously broad as that afforded to the President in the proprietary context, the basis for that deference is different.  A grant of broad authority in one realm does not necessarily translate into a basis for finding a similarly-broad grant of authority in an entirely different context, even when statutory grants of power might be superficially similar.

Both *Learning Resources* and *Hawaii* dealt with the intersection between congressional authority and executive power in areas where the scope of Congress's power and the President's power are amorphous and evolving.[3]  We need not rely on those cases

---

[3] *See Learning Res.*, 146 S.Ct. at 642 ("As a general matter, the President of course enjoys some independent constitutional powers over foreign affairs even without congressional authorization.  And Congress certainly may intend to give the President substantial authority and flexibility in many foreign affairs or national security contexts. . . . [However], the President and

because the parameters of the authority at issue here are clearly delineated and limited. While all three statutes contain similar language, the President's ability to prescribe policies and directives under 40 U.S.C. § 121(a) is more tightly constrained by the clause that states the "policies must be consistent with [the] subtitle." This type of restricting language is not present in 50 U.S.C. § 1701(a)(1)(B) and 8 U.S.C. § 1182(f).

Thus, contextual differences between *Learning Resources*, *Hawaii*, and the instant case are significant enough to doubt the applicability of *Learning Resources* or *Hawaii* when concluding that the President enjoys broad authority under 40 U.S.C. § 121(a). Fortunately, this Court does not need to opine on that issue. Executive order No. 14,063 at issue here fits squarely within the plain language of 40 U.S.C. § 121(a). We need not definitively analyze whether the statute contains "sweeping, discretion-conferring language" in the same way as language in very different statutes; nor should we try to advance a one-size-fits-all approach to Presidential authority. *See Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885) (explaining that courts should "never . . . formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied"); *Brockett v. Spokane Arcades*,

---

Congress *do not* enjoy concurrent constitutional authority to impose tariffs during peacetime." (alterations adopted) (citations and quotation marks omitted)); *Hawaii*, 585 U.S. at 690 ("Congress's decision to authorize a benefit for many of America's closest allies did not implicitly foreclose the Executive from imposing tighter restrictions on nationals of certain high-risk countries." (citation and quotation marks omitted)).

25-11375                ABUDU, J., Concurring                    5

*Inc.*, 472 U.S. 491, 501 (1985) (same); *Immigr. & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").